See also, 545 F.Supp. 1117, 551 F.Supp. 110.

**Perry D. JENKINS, Annabelle Jenkins, and Stuart A. Kaneko as Special Administrator of the Estate of Jeffrey Scott Jenkins, Deceased, Plaintiffs-Appellees-Cross-Appellants,**

v.

**WHITTAKER CORPORATION, d/b/a Bermite Corporation, a division of Whittaker Corporation, a California corporation, Defendant-Appellant-Cross-Appellee.**

Nos. 84–2012, 84–2084.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1985.

Decided March 24, 1986.

John D. Thomas, Jr., Cronin, Fried, Sekiya & Kekina, Honolulu, Hawaii, Allan S. Haley, Nevada City, Cal., for plaintiffs-appellees-cross-appellants.

Burnham H. Greeley, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, Ronald M. Greenberg, Beverly Hills, Cal., for defendant-appellant-cross-appellee.

Before TANG and WIGGINS, Circuit Judges, and WILLIAMS,* District Judge.

WIGGINS, Circuit Judge.

Defendant Whittaker Corporation ("Whittaker") appeals a judgment of $300,000 against it following a jury verdict in a wrongful death action by the parents and the administrator of the estate of decedent Jeffrey Scott Jenkins (collectively "plaintiffs"). Whittaker alleges the district court erred in various jurisdictional, choice of law, evidentiary, and substantive rulings. Plaintiffs cross-appeal the district court's denial of their motion for prejudgment interest. We have jurisdiction over the appeals under 28 U.S.C. § 1291 (1982). We affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL HISTORY

Before entering the military, decedent Specialist Fourth Class Jeffrey Scott Jenkins was domiciled in Indiana, and he intended to return there after his enlistment. While in the service, Jenkins lived on a military base on federal government property within the state of Hawaii. Plaintiffs Perry and Annabelle Jenkins, Jenkins's parents, are residents and domicilaries of Indiana. Stuart A. Keneko, a Hawaii citizen, is administrator of Jenkins's estate, which is being probated in Hawaii.

Defendant Whittaker Corporation ("Whittaker") is a California corporation with its principal place of business in Los Angeles. It is a billion-dollar-a-year corporation, with between one and two percent of its revenues coming from its Bermite division. It has no offices, employees, or agent for service of process in Hawaii, nor is it licensed to do business there.

In the early 1970's, Whittaker's Bermite division contracted to supply atomic simulators to the Army, based on the Army's design.[1] Whittaker assembled and delivered one lot of simulators to the Army in Saugus, California, in mid-1974.

On May 11, 1978, as part of demolition training for soldiers at the Pohakuloa Training Area on the island of Hawaii, Jenkins and other personnel of the 65th Engineer Batallion set up two atomic simulators about 50 feet apart. One of these simulators was from the lot provided by Whittaker (the "Whittaker simulator"); the other was manufactured by Pace Corporation (the "Pace simulator").

The Whittaker simulator was set off first and seemed to detonate normally. Engineer personnel then tried several times to detonate the Pace simulator, without success. After waiting between 10 and 30 minutes, Jenkins, Capt. William P. Fitzgerald, and another soldier approached the discharged (but still burning) Whittaker simulator to remove the ignition wires and transfer them to the Pace simulator.

As the party approached the still-burning Whittaker simulator, Jenkins expressed concern about the fire and suggested using a fire extinguisher. Fitzgerald said the fire extinguisher was unnecessary and might be needed later, and Jenkins agreed. While they were transferring the wires, a second explosion occurred, lifting the soldiers off their feet and throwing them back. Jenkins was critically injured and died that evening.

Jenkins's parents brought suit against Whittaker for themselves and on behalf of Jenkins's estate. The jury returned a verdict of $300,000 for the plaintiffs on August 12, 1983, and judgment was entered in that amount on August 29. On September 30, plaintiffs moved for prejudgment interest. The trial court eventually denied the motion as untimely.[2]

---

* Honorable David W. Williams, Senior United States District Judge for the Central District of California, sitting by designation.

1. An atomic simulator is a 55-gallon steel drum packed with explosive powder that, when detonated, simulates the visual and aural effects of a nuclear blast on the ground. It is not radioactive.

2. The procedural posture of plaintiff's cross-appeal is somewhat complicated. The district court originally denied plaintiffs' motion for prejudgment interest on the ground that Hawaii law required pleading and proof of prejudgment interest as an element of damages at trial, relying on *McKeague v. Talbert,* 3 Hawaii App. 646, 658 P.2d 898 (1983). After defendant Whittaker

## I.

## PERSONAL JURISDICTION

Whittaker argues that the trial court in the district of Hawaii had no personal jurisdiction over it.[3] A district court's jurisdiction over the person is a question of law, reviewable *de novo* by this court. *Cubbage v. Merchent*, 744 F.2d 665, 667 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). The trial court's findings of fact are reviewed under the clearly erroneous standard. *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Personal jurisdiction requires a two-part showing: (1) that the forum state has an applicable statute conferring jurisdiction on nonresidents, and (2) that the assertion of jurisdiction under the statute comports with constitutional requirements of due process. *Colonial Leasing Co. v. Pugh Brothers Garage*, 735 F.2d 380, 383 (9th Cir.1984). Hawaii law gives jurisdiction to the full extent allowed by the Constitution, *Cowan v. First Insurance Co. of Hawaii*, 61 Hawaii 644, 649, 608 P.2d 394, 399 (1980), so the only issue we need address is whether Hawaii's jurisdiction over Whittaker comports with due process.

Whittaker concedes that a manufacturer that sells its products to a distributor with knowledge that the distributor will distribute the product on a nationwide basis may be sued in any jurisdiction in which the product is disseminated. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 567–68, 62 L.Ed.2d 490 (1980). Whittaker asserts, however, that a different standard should apply to manufacturers of military products, limiting suit to the site of manufacture or sale, relying on *McKay v. Rockwell International Corp.*, 704 F.2d 444, 452–53 (9th Cir.1983), *cert. denied,* 464 U.S. 1043,

---

appealed the jury verdict against it, plaintiffs timely cross-appealed the denial of their motion for prejudgment interest. While the appeal was pending in this court but before it was calendared, the district court concluded it had misread *McKeague* and, through various contacts with counsel, invited plaintiffs to move the district court to reconsider under Fed.R.Civ.P. 60(b)(6) its denial of plaintiffs' motion for prejudgment interest. Plaintiffs made this motion, and the district court indicated that it was willing to entertain and inclined to grant the motion. *See Long v. Bureau of Economic Analysis*, 646 F.2d 1310, 1318 (9th Cir.) (suggesting this procedure), *vacated on other grounds*, 454 U.S. 934, 102 S.Ct. 468, 70 L.Ed.2d 242 (1981). Plaintiffs then sought and received a limited remand from this court, allowing the district court to consider the motion for reconsideration. The district court reconsidered its denial of plaintiffs' motion for prejudgment interest and concluded that, despite its error in interpreting *McKeague*, denial was still required because the motion was untimely under Rule 59(e) and the court thus had no jurisdiction to entertain it (hearing held February 28, 1985; order entered, March 18, 1985). Plaintiffs then sought to amend their notice of appeal in this court to include the March 18 order and to amend the record on appeal to include the transcript of the February 28 hearing. This court denied those requests, but allowed copies of the transcript to be lodged with the clerk.

To remedy this procedural inconsistency and allow us to deal with the current ground for the denial, untimeliness under Rule 59(e), we announced at oral argument our consideration of the Rule 59(e) ground and our addition of the Feb. 28 hearing transcript to the record on appeal.

**3.** Plaintiffs assert that Whittaker waived any objection to personal jurisdiction at trial. They argue that Whittaker objected to their questioning of a Whittaker employee and to their introduction of an advertisement alleged to bear on personal jurisdiction. In seeking to exclude the ad on relevancy grounds, Whittaker's counsel said, "There is no jurisdictional issue in this trial at this time. Therefore, I would object on those grounds of relevancy." After the court overruled its objection, Whittaker sought a running objection. The court replied, "All right. Your running objection is noted. Of course it is mooted if you raise the jurisdictional issue again, but why don't [plaintiffs] proceed." Plaintiffs note that jurisdiction was never raised again until this appeal.

Plaintiffs argue that in light of Whittaker counsel's comment and attempt to exclude evidence relevant to jurisdiction, it would be unfair to allow Whittaker to argue here that the plaintiffs have not met their burden of proof.

Although Whittaker may have misled the court on this issue, plaintiffs ultimately suffered no prejudice from Whittaker's actions. Whittaker's objections were overruled and plaintiffs were allowed to submit the evidence and make their record. In light of this, we do not view Whittaker's actions as waiving the issue.

104 S.Ct. 711, 79 L.Ed.2d 175 (1984). That case, however, deals with the appropriateness of applying the ordinary consumer's expectation of safe product design to users of military products. *Id.* It in no way suggests that a *manufacturer* of military products who places those products in a nationwide distribution system has different "contacts" with a destination state than an ordinary manufacturer. *See World-Wide Volkswagen,* 444 U.S. at 291, 100 S.Ct. at 564.

In light of the findings of fact, which are not disputed here, the trial court properly asserted personal jurisdiction over Whittaker.

## II.

### CHOICE OF LAW

Whittaker argues that the district court erred in applying Hawaii law.[1] Choice of law is a question of law reviewable *de novo* by this court. *See In re McLinn,* 739 F.2d 1395, 1398 (9th Cir.1984).[5] Findings of fact by the district court, however, may be reversed by this court only if they are clearly erroneous. *McConney,* 728 F.2d at 1200.

Both parties correctly note that choice of law is controlled by *Peters v. Peters,* 63 Hawaii 653, 634 P.2d 586 (1981), the only Hawaii case on the issue.[6] *Peters* creates a presumption that Hawaii law applies unless

another state's law "would best serve the interests of the states and persons involved." *Id.* at 660, 634 P.2d at 591.[7] *Peters* involved a suit by a nonresident wife against her nonresident husband for injuries she sustained in Hawaii while riding in a rented car he was driving. *Id.* at 655, 634 P.2d at 588. The law of their domicile permitted interspousal tort actions; Hawaii law did not. *Id.* at 656–60, 634 P.2d at 588–91. The *Peters* court noted Hawaii's unique geographic and economic position and found that:

> Our visitors are domiciled throughout the United States and in many foreign countries, and a reliance on the law of the domicile to determine the viability of interspousal actions would neither provide predictability of result nor simplify the judicial task. More importantly, any resulting significant increase in the number of tort actions entertained by our courts will adversely affect premiums indirectly payable by residents of Hawaii who lease "U-Drive" cars, though Hawaii couples remain bound by interspousal immunity and will not benefit from the judicial expansion of compulsory insurance coverage which would be responsible for the premium increase.

*Id.* at 666, 634 P.2d at 594–95.

The first portion of the *Peters* court's discussion applies to military per-

---

4. The laws that are colorably applicable are Hawaii, Indiana, California, or "federal common law." The differences in the laws would significantly affect major issues in the case, including the statute of limitations, comparative negligence, recovery for pain and suffering and lost earnings, and the standard for *res ipsa loquitur.*

5. This circuit no longer gives deference to a district court judge's interpretation of the law of the state in which he or she sits. *McLinn,* 739 F.2d at 1397–1403.

6. Hawaii choice-of-law rules apply as a result of 16 U.S.C. § 457 (1982), which provides:

    In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the

place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

See *Vasina v. Grumman Corp.,* 644 F.2d 112, 117 (2d Cir.1981) (applying situs state law to cause of action arising on military property based on this section).

7. The full passage reads:

    [W]e would not be obliged to apply the law of Hawaii if our conflict-of-laws analysis indicates that resort to New York law [the law of plaintiff's and defendant's domicile] would best serve the interests of the states and persons involved.

*Peters,* 63 Hawaii at 660, 634 P.2d at 591; *see also DeRobert v. Gannett Co.,* 83 F.R.D. 574, 576–83 (D.Hawaii 1979) (anticipating the "interests analysis" approach of *Peters* ).

sonnel as well as tourists.[8] Because of Hawaii's unique strategic position, much of its economy and population depends on the military, just as another large portion depends on tourism. Military personnel, like tourists, are likely to be domiciled throughout the United States. In view of the Hawaii court's articulated concern with predictability of result and simplification of the judicial task, this fact supports the application of Hawaii law in this case. *See Jenkins v. Whittaker Corp.*, 545 F.Supp. 1117, 1118 (D.Hawaii 1982) (district court's order relying on this ground).

In addition, the accident here actually took place in the state of Hawaii, albeit on federal land, and Hawaii has an interest in protecting those within its borders from injury from defective products imported into the state. Whittaker argues that because Jenkins lived and worked on federal land, he was not actually "in Hawaii" for purposes of a choice-of-laws interest analysis. *See Foster v. Day & Zimmermann, Inc.*, 502 F.2d 867, 870–71 (8th Cir.1974). This is too extreme and technical an approach to the choice-of-laws question, however, especially because the occurrence of the accident "in Hawaii" is what requires application of Hawaii choice-of-law rules in the first place. *See* 16 U.S.C. § 457 (1982).

Whittaker claims that California or Indiana law should be applied. Whittaker never specifies, however, any strong interest of those states that would best be served by applying their laws.[9] *See Peters*, 63 Hawaii at 660, 634 P.2d at 591. Nor does Whittaker identify what interests of the

parties would be served by applying Indiana or California law, *id.*, aside from the obvious difference in ultimate result favoring Whittaker.[10]

Under *Peters*, Hawaii has an interest in the case and Whittaker has failed to show any compelling interest of another state requiring application of different law. The trial court was correct in applying Hawaii law.

### III.

### EVIDENTIARY RULINGS

*A. Standard of Review*

We review trial court evidentiary rulings for abuse of discretion. *Pierce Packing Co. v. John Morrell & Co.*, 633 F.2d 1362, 1364 (9th Cir.1980).

*B. Conclusions and Opinions in the Government Reports*

Following the accident, army personnel prepared several reports. The first of these, the "Picatinny Arsenal Report" ("PAR"), was a technical analysis focused on the atomic simulator itself. It concluded that the second explosion resulted from an old unexploded demolition item on the range and that the possibility of a second explosion in the Whittaker simulator itself was "remote." It recommended continued use of other simulators in the same lot.

The second report, the "White Report," was an investigative report focused on whether army personnel complied with ap-

---

**8.** The second portion of the *Peters* discussion does not apply to the case at hand.

**9.** Whittaker argues that California has an interest in limiting recovery on the contract because the contract was made and performed in California and Hawaii has no interest in it. *See* Hawaii Rev.Stat. § 490:1–105(1) (1976) (Hawaii UCC). For this reason, Whittaker argues, California's one-year statute of limitations should apply and the breach-of-warranty action should be barred. *See Becker v. Volkswagen of America, Inc.*, 52 Cal.App.3d 794, 802, 125 Cal.Rptr. 326, 331 (1975). However, the reason California imposes a one-year limitation on personal injury actions based on breach of warranty,

rather than the four-year limit in the California Commercial Code, is that California does not regard such an action as resting on the contract at all but on strict liability. *Id.* It would be anomalous, therefore, to apply the one-year California limitation on the ground that the cause of action arises out of the California contract when California itself sets that limitation on the ground that the warranty action does *not* arise out of the contract.

**10.** Whittaker cannot claim it relied on California law's limitations. It was only fortuity that the injured person was not a Hawaii citizen, a circumstance that clearly would have allowed application of Hawaii law.

plicable rules and regulations. The first five paragraphs of the report consisted of observations by White of the accident area made the day after the accident. Paragraph 6 listed various "shortcomings" concerning the setup and firings of the two simulators, and paragraph 7 concluded that unauthorized operations had occurred and that the ammunition should have functioned correctly if set up correctly.

Plaintiffs moved *in limine* to exclude the opinions and conclusions in the PAR and the White report. The court excluded the opinions and conclusions in both reports [11] and sustained that decision at trial.

Whittaker contends that the trial court abused its discretion in excluding the conclusions and opinions [12] in the PAR and White Report.[13] It asserts that the opinions and conclusions were admissible under the business and public records exceptions to the hearsay rule, Fed.R.Evid. 803(6) and (8)(C).[14] Whittaker correctly notes that both reports resulted from investigations made under authority of law,[15] and it argues that these conclusions and opinions were admissible as factual findings unless they were untrustworthy. Conclusions and opinions do not render reports *ipso facto* inadmissible. *Miller v. New York Produce Exchange*, 550 F.2d 762, 769 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *see Ellis v. International Playtex, Inc.*, 745 F.2d 292, 301–02 (4th Cir.1984) (exclusion of two government epidemilogical studies on toxic shock syndrome was improper despite tentative conclusions included in studies). Whittaker argues that nothing here indicated the reports were not trustworthy and that the trial court based its exclusion solely on the ground that Rule 803(6) or (8) did not allow for opinions or conclusions as exceptions to the hearsay rule.

Contrary to Whittaker's assertion, the district court did not base its decision on that ground alone. The discussions of the exclusion, both *in limine* and during trial, show that the court addressed several other concerns in keeping the reports out.

First, the court was clearly concerned about the competence and trustworthiness of the reports. Plaintiffs' counsel noted that Mr. Labudzinski, the PAR author, had no competence or experience with atomic simulators, arrived at the accident scene over a week after the accident, never talked to any of the personnel involved, and for those very reasons had not been quali-

**11.** The court also excluded, on Whittaker's motion, a third government report on the accident. The third report, the Ganetti Report, was an "in-house" investigative report by Lt. Col. Albert Ganetti of the 65th Engineer Batallion, the unit involved in the accident. Ganetti based his report on interviews and sworn statements of witnesses, technical manuals, and photographs of the accident site, but conducted no on-site investigation. His report concluded that the source of the second explosion was inside the barrel and that, although base personnel had not followed procedures exactly, any violations had not contributed to the accident. The court considered the three reports together and excluded the opinions and conclusions of all three at the same time.

**12.** Only the opinions and conclusions in the reports are contested on this appeal. The "pure facts" in both reports either came into evidence at trial or were explicitly not offered.

**13.** Plaintiffs assert that Whittaker waived its objection to the exclusion of the entire White report by offering to take the conclusions out of the report before its admission and withdrawing the offer of the report's cumulative factual as-

sertions. This contention of waiver is without merit. Under Fed.R.Evid. 103(a)(2), error is preserved if the substance of the evidence is offered or is apparent from context. Viewing the record as a whole, the court was certainly aware of the contents of the White report and of Whittaker's unrelenting wish to have it admitted in its entirety.

**14.** This rule provides that records of regularly conducted activity and public records and reports are admissible, notwithstanding the hearsay rule, "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(6), (8)(C).

**15.** Plaintiffs' assertion that the reports were properly excluded under Rule 803(8)(C) because they were not *required* by law is without merit. The plain language of the rule requires only that the report be authorized, not mandated, by law. *Fraley v. Rockwell International Corp.*, 470 F.Supp. 1264, 1266 (S.D.Ohio 1979); *see also Walker v. Fairchild Industries, Inc.*, 554 F.Supp. 650, 655 (D.Nev.1982).

fied as an expert by Whittaker. Plaintiffs' counsel also added that Mr. White, author of the White report, was even less qualified than Labudzinski.[16] Whittaker's counsel did not dispute any of these assertions, and the court ruled to exclude Labudzinski's and White's opinions immediately thereafter. The trial court is generally the best judge of the trustworthiness and reliability of such reports, *see Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821 (10th Cir. 1981), and the circumstances surrounding the reports in question support the trial court's judgment.

The trial court was also concerned about cumulative evidence.[17] The PAR and the White report would have put into evidence opinions and conclusions of nonexperts who could not be cross-examined, although Whittaker also intended to call an expert, Mr. Kadlec, to testify to those same opinions and conclusions at trial. Such an expert is both more trustworthy (because of his expertise) and subject to cross-examination, making his opinions far more useful to the jury than the same opinions in the reports.[18]

In summary, in light of the suspect reliability of the offered reports and the cumulative effect of their relevant passages, the district court did not abuse its discretion in excluding them from evidence.

## C. LoFiego's Expert Opinion

At trial, Whittaker offered the testimony of Louis LoFiego, Vice President and Technical Director of Whittaker's Bermite division, a chemical engineer with experience with black powder and explosives of the type involved in the simulators. LoFiego had not been noticed to plaintiffs as an expert witness before trial. He testified, over plaintiffs' objections, to his education and experience, the general nature and characteristics of the explosives involved, the specific design of the Whittaker simulator, and the fact that he had never personally witnessed an ignition of confined black powder in which less than all of the powder ignited. He was not, however, allowed to express an opinion on whether less than all the black powder in an atomic simulator will ignite during what appears to experienced observers to be a normal ignition.[19]

---

**16.** White testified to his factual observations at trial. He was not qualified as an expert, however, and hence did not testify to his opinions or conclusions based on those observations. *See* Fed.R.Evid. 701 (lay opinion testimony limited to that "rationally based on the perception of the witness").

**17.** The court's general concern with unnecessary repetition is explicit in its treatment of the purely factual portions of the PAR. When Whittaker claimed that most of the facts in the PAR had already been admitted anyway, the court wondered why the same facts needed to come in again through the report, especially when it was based on hearsay.

As plaintiffs point out, all the *relevant* admissible opinions in the two reports that Whittaker claims never reached the jury were in fact testified to at trial. Expert Kadlec testified that the explosion took place outside the barrel and that the Whittaker atomic simulator functioned normally. White himself testified to the color of the drum containing the spent Whittaker simulator and the presence of loose rock in the area. Although White did not testify to his opinions that a simulator does not generate enough heat to discolor the drum or that the drum had been subjected to excessive heat from outside, those opinions are similar to opinions

specifically excluded at trial because of White's lack of expertise (RT 1085:18–1087:3 (White not qualified to give opinion about reason for burnt appearance of chipboard separator)). Finally, the White report's statements about the failure to allow 30 minutes after the misfire before approaching the unexploded Pace simulator and the failure to follow other misfire procedures are irrelevant to the issues in this case and therefore were not properly admissible from *any* source. See section III(D) *infra*.

**18.** Indeed, it would be anomalous if White's opinions were allowed into evidence as part of a report that is not subject to cross-examination when White himself lacked the expertise to testify to those same opinions at trial where he *could* be cross-examined.

**19.** The question LoFiego was not allowed to answer was:

> Mr. LoFiego, assume an ignition of an atomic simulator, assume further that a mushroom cloud is observed by persons who have had prior experience with atomic simulators, assume further that those persons perceived that ignition to be a normal ignition. Given those conditions, will less that all five bags which are contained in the smoke charge barrel ignite?

Whittaker claims that the trial court abused its discretion in refusing to allow LoFiego to give his opinion on plaintiffs' "two explosions" theory. Whittaker argues that LoFiego clearly qualified as an expert and that, as the representative of a party, he had a right to testify as to the party's theory of how the accident happened.

The trial court properly exercised its discretion in excluding LoFiego's expert testimony, however, because Whittaker gave the plaintiffs no advance notice of the fact and substance of his expert testimony and therefore no opportunity to prepare to meet it. The plaintiffs' third set of interrogatories specifically asked for the names, credentials, and the substance and basis of the testimony of all testifying experts, as allowed by Fed.R.Civ.P. 26(b)(4)(A)(i). Whittaker named no independent experts in its response, for reasons not relevant here, but added: "Whittaker may call Bermite personnel, some of whom have been deposed, but is unsure whether the Court would treat their testimony as expert." [20] In addition, Whittaker apparently never supplemented its answer to this question as required by Fed.R.Civ.P. 26(e)(1).

Whittaker argues that *parties* who are also experts do not fall within the scope of Rule 26(b)(4)(A)(i), citing *Baran v. Presbyterian University Hospital,* 102 F.R.D. 272, 273–74 (W.D.Pa.1984). *Baran* relies on the advisory committee notes to the Rules:

It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or a viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

Fed.R.Evid. 26(b)(4) advisory committee notes.

The language quoted does not apply to LoFiego. He was not a viewer or actor with regard to the disputed question; in fact, he could not be, because the question posed was hypothetical, in the traditional form of expert interrogation. The question clearly called for an opinion based on LoFiego's expertise rather than his observation of a specific incident.

Moreover, Whittaker failed adequately to state the substance of LoFiego's testimony even as an ordinary witness in its Pretrial Statement.[21] Whittaker's entry on LoFiego read:

15. Louis LoFiego: Whittaker employee to testify as to the manufacture of the Whittaker simulator and Whittaker's dealing with the government and Army.

This summary gives no indication that LoFiego will testify to his opinions about plaintiffs' theory of the explosion.

■ In light of the lack of notice to the plaintiffs and the cumulative nature of the opinion, the trial court did not abuse its discretion in excluding LoFiego's opinion on the "two explosions" theory.

### D. Relevance of Various Facts Surrounding the Accident

■ Whittaker also claims that the district court abused its discretion in excluding evidence of various facts that show

**20.** Whittaker argues that plaintiffs were in any event not prejudiced by the lack of notice because they in fact deposed LoFiego and thus had ample opportunity to probe and examine his opinions, expert or otherwise, about the cause of the second explosion. LoFiego was deposed on December 5, 1980 (deposition filed Feb. 25, 1982), however, well over a year before he was noticed even as an ordinary trial witness. Without such notice, the opportunity to depose does not remove the prejudice. *See* Fed.R.Civ.P. 26(b)(4) advisory committee notes ("The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand.").

**21.** Under local district court rules, this statement must include:

(i) Witnesses to be called. A list of all witnesses likely to be called at trial, except for impeachment or rebuttal, together with a brief statement following each name describing the substance of the testimony to be given. Hawaii L.R. 235–7(i) (1982).

contributory negligence by Jenkins and other army personnel. The excluded facts pertain to the Pace simulator, the simulator that did *not* explode.[22] Nevertheless, Whittaker claims, these incidents not only were relevant to Jenkins' death but proximately caused that death. In essence, Whittaker's theory is: but for various acts of negligence with respect to the Pace simulator, Jenkins would not have been in the area of the Whittaker simulator when the second explosion occurred and thus would not have been killed. Even assuming this statement is true, however, it resolves only the issue of *actual* cause and not, as Whittaker argues, *proximate* cause.

Proximate cause is lacking because the alleged negligence with respect to the Pace simulator has no connection with the actual injury. The acts asserted, however much they may have increased the risk of injury from an explosion of the Pace simulator, had absolutely no relation to the risk that actually matured, the second explosion at the Whittaker simulator.[23] The duty breached by the alleged negligence did not encompass the hazard that actually came about, and any such negligence is therefore irrelevant to the issue of proximate cause. *See* W. Keeton, *Prosser and Keeton on Torts* § 42 (5th ed. 1984).

For this reason, the trial court did not abuse its discretion in excluding evidence of negligence in the operation of the Pace simulator.

## IV.

### DIRECTED VERDICT

#### A. Standard of Review

Whittaker claims that Capt. Fitzgerald's action in having the soldiers approach the simulators constitutes a superseding cause of the accident as a matter of law. In effect, Whittaker claims that the evidence compels the conclusions that Fitzgerald's actions were negligent, immediately caused the accident, and were not foreseeable to Whittaker. The jury instructions allowed such findings and the jury did not make them, so error exists only if the findings were legally compelled. This amounts to an argument that the court should have directed a verdict for Whittaker based on superseding cause. The standard for reviewing the propriety of a directed verdict is the same for this court as for the court below. We must view the evidence in the light most favorable to the nonmoving party and draw all possible inferences in favor of that party. *Blanton v. Mobil Oil Corp.,* 721 F.2d 1207, 1219 (9th Cir.1983), *cert. denied,* ── U.S. ──, 105 S.Ct. 1874, 85 L.Ed.2d 268 (1985).

#### B. Merits

Viewed in a light most favorable to plaintiffs, the evidence does not compel the conclusions Whittaker urges, and a directed verdict was therefore not appropriate. Contrary to Whittaker's assertion, there is no evidence that Fitzgerald "ordered" Jenkins to approach the burning simulator. Furthermore, although Fitzgerald's expertise was in issue at trial, the jury could reasonably have found that his behavior was not negligent, especially in view of the general agreement that the simulator was not supposed to explode twice. In addition, the jury had sufficient evidence to conclude that Whittaker could reasonably foresee personnel approaching the simulator after detonation, again because the simulator

---

**22.** Whittaker's brief specifically points out (as relevant facts excluded at trial) the unauthorized use of communications wire in connecting the Pace simulator and the failure of Jenkins's party to wait the recommended 30 minutes after the misfire of the Pace simulator before approaching it. Whittaker alludes to other acts of negligence and violations of military regulations but does not specify the other "excluded facts." Most of the facts identified here were in fact presented to the jury in one way or another.

**23.** For example, the regulation requiring 30 minutes delay before approaching a misfired simulator was obviously designed to protect the operators from a delayed explosion of the misfired simulator, not to prevent them from coming into an area where a different, unrelated explosion might occur.

was not supposed to explode twice. In light of these reasonable conclusions, the evidence did not compel a finding that Fitzgerald's actions were a superseding cause of Jenkins' injuries and a directed verdict was not appropriate.

## V.

## JURY INSTRUCTIONS

### A. Standard of Review

In assessing jury instructions, we consider the charge as a whole to determine whether it is misleading or misstates the law to the prejudice of the objecting party. *Smiddy v. Varney,* 665 F.2d 261, 265 (9th Cir.1981), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). "We will not reverse a judgment because of a mistake in jury instructions if the instructions fairly and adequately cover the issues presented." *Coursen v. A.H. Robins Co.,* 764 F.2d 1329, 1337, *corrected,* 773 F.2d 1049 (9th Cir.1985). An error in jury instructions in a civil trial does not require reversal if it is more probably harmless than not. *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983).[24]

### B. Res Ipsa Loquitur

■ Whittaker asserts that the trial court erred in allowing the jury to apply *res ipsa loquitur* to the negligence count.[25] Whittaker claims that a *res ipsa loquitur* instruction would have been permissible only if the jury could have found that Whittaker had "control and management" of the simulator at the time of the accident. Under Hawaii law, however, *res ipsa loquitur* requires a finding of exclusive control and management of the injury-producing instrumentality only at the time of the negligence, not at the time of the resultant injury. *See Guanzon v. Kalamau,* 48 Hawaii 330, 337, 402 P.2d 289, 294 (1965); *Ciacci v. Woolley,* 33 Hawaii 247, 258–59 (1934).

Whittaker also claims that a *res ipsa loquitur* instruction was improper because evidence at trial permitted an inference that the second explosion did not come from the Whittaker simulator. Whittaker misconstrues the point at which *res ipsa loquitur* is applicable in this case; the jury instruction explicitly made the application of *res ipsa loquitur* conditional on other findings. Specifically, before the jury was permitted to infer Whittaker's negligence under *res ipsa loquitur,* it was required to find by a preponderance of the evidence that the accident was caused by the Whittaker simulator. This requirement allowed

24. Whittaker objects to the trial court's jury instructions on the issues of negligence, implied warranty, and strict liability. The jury found Whittaker liable under all three theories, and each independently supports the damages awarded. Because we approve the jury instructions on negligence and strict liability, and because the jury's verdicts on those issues are supported by substantial evidence, see below, we do not consider the propriety of the jury instruction on implied warranty.

25. The disputed instruction is:

On the issue of negligence, one of the questions for you to decide in this case is whether the accident involved occurred under the following conditions:

First, that it is the kind of accident which ordinarily does not occur in the absence of someone's negligence;

Second, that it was caused by an agency or instrumentality in the exclusive control of the defendant originally, and which was not mishandled or otherwise changed after defendant relinquished control; and

Third, that the accident was not due to any voluntary action or contribution on the part of Jeffrey Scott Jenkins, which was the responsible cause of his injury.

If, and only in the event that you should find all these conditions to exist, you are instructed as follows:

From the happening of the accident involved in this case, you may draw an inference that a proximate cause of the occurrence was some negligent conduct on the part of the defendant.

However, you shall not find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant unless you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant. (RT 1548:4–1549:3)

the jury to weigh Whittaker's evidence concerning the source of the second explosion. The instruction permitted the jury to find negligence under *res ipsa loquitur* only if it found Whittaker's evidence of a second explosion outside the barrel unpersuasive.[26]

Under Hawaii law, the trial court gave the correct *res ipsa loquitur* instruction.

## C. Strict Liability

Whittaker also claims that the trial court erred in its jury instruction on strict liability.[27] Whittaker argues that the trial court's jury instruction on strict liability amounted to a *res ipsa loquitur* instruction and that *res ipsa* is inapplicable to strict liability. The Hawaii Supreme Court stated that state's rule of strict liability as follows:

[O]ne who sells or leases a defective product which is dangerous to the user or consumer or to his property is subject to liability for physical harm caused by the defective product to the ultimate user or consumer, or to his property, if (a) the seller or lessor is engaged in the business of selling or leasing such product, and (b) the product is expected to and does reach the user or consumer without substantial change in its condition after it is sold or leased.

*Stewart v. Budget Rent-A-Car Corp.*, 52 Hawaii 71, 75, 470 P.2d 240, 243 (1970) ("essentially" adopting *Second Restatement of Torts*, § 402A). In the present case, Whittaker does not dispute that it was in the business of selling atomic simulators. A second element, the absence of substantial change, is clearly required by the jury instruction given by the trial court.[28]

The trial court's jury instructions also adequately required the jury to find the

---

**26.** Moreover, even if Whittaker's proffered evidence had tended to directly disprove its negligence, as Whittaker seems to argue it did, rather than to disprove the second explosion in the simulator, as it in fact did, the *res ipsa loquitur* instruction would still have been proper. Under Hawaii law, *res ipsa loquitur* merely *allows* an inference of negligence "in the absence of any explanation by the defendant tending to show that the injury was not due to his lack of care." *Ciacci v. Woolley*, 33 Hawaii 247, 257 (1934) (quoting *Morgan v. Yamada*, 26 Hawaii 17, 24 (1921)). The jury would still have been allowed to consider any contrary evidence Whittaker might have presented.

**27.** The disputed instruction reads:

Plaintiffs claim damage for personal injuries alleged to have been caused by a defective condition in an M142 atomic simulator manufactured and sold by defendant Whittaker Corporation.

A product is in a defective condition if, because of its manufacture or design, the product does not meet the reasonable expectations of the ordinary consumer or user as to its safety.

In determining whether or not the M142 atomic simulator was defective, you are instructed that plaintiffs need not prove a specific defect. It is sufficient if you find from the evidence that the M142 atomic simulator exploded twice, causing the accident, as a result of some failure due to a defective condition in the M142 atomic simulator.

If you determine, after considering all of the evidence, direct and circumstantial, that the accident here would not have occurred in the ordinary course of events but for the existence of a defect in the M142 simulator, then you can infer that the cause of the accident arose from a defect in the simulator.

**28.** For example, the trial court's instructions provided at various points (emphasis added):

The manufacturer of an article is subject to liability for injuries proximately caused by a defect in manufacture of the article *which existed when the article left possession of the manufacturer*....

In order for plaintiffs to recover against Whittaker on their claim of manufacturing defect, the plaintiffs have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following essential elements.

. . . .

2. That the atomic simulator was expected to and did reach Jeffrey Scott Jenkins *without substantial change in the condition in which Whittaker first sold it*....

. . . .

The defendant Whittaker is liable only for defective conditions *which were present at the time Whittaker sold the atomic simulator and parted with possession of it*. Unless you find that Jeffrey Scott Jenkins' death was caused by a defective condition in the Whittaker atomic simulator *which was in existence when it was first sold to the army in 1974*, none of the plaintiffs are entitled to recover from Whittaker.

remaining elements of liability: defect and cause. These elements may be proved by purely circumstantial evidence. *Stewart v. Budget Rent-A-Car*, 52 Hawaii at 77, 470 P.2d at 243–44; *accord, McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917, 920 (D.C.App.1969). In most jurisdictions, purely circumstantial evidence of a defect will suffice to take the case to the jury provided that the plaintiffs have introduced evidence on two other points. "First, plaintiff must present evidence which would tend to negate causes for an accident other than a defect in the product." *Stewart v. Ford Motor Co.*, 553 F.2d 130, 137 (D.C.Cir. 1977) (collecting cases); *see also Wakabayashi v. Hertz Corp.*, 66 Hawaii 265, 271, 660 P.2d 1309, 1313 (1983) (allowing case to go to jury based on purely circumstantial evidence of defect where plaintiff presented evidence tending to negate plaintiff's actions as cause of accident). "Second, plaintiff must present proof which would suggest that whatever defect might have existed was one introduced into the product by the defendant." *Stewart v. Ford Motor Co.*, 553 F.2d at 137 (collecting cases); *cf. Guanzon*, 48 Hawaii at 337, 402 P.2d at 294 (requiring control and management of the injury-producing instrumentality at the time of the negligence for application of *res ipsa loquitur*). The amount of evidence necessary to meet these two requirements is not great. *Stewart v. Ford Motor Co.*, 553 F.2d at 137 (collecting cases).

In the present case, plaintiffs provided evidence on both these points. In response to Whittaker's only alternative theory of the accident, the explosion of a "dud" already present on the range, plaintiffs introduced evidence that the range was inspected for duds before the atomic simulators were set up and that the ground near the Whittaker simulator was smooth and undisturbed by potholes after the second explosion. On the issue of Whittaker's responsibility for the defect, plaintiffs presented evidence suggesting that the atomic simulator was in substantially the same condi-

tion at the time of the accident as it had been when Whittaker delivered it to the army. *See Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 637–38 & n. 4 (8th Cir.1972) (allowing recovery under strict liability without proof of specific defect where airplane "was substantially in the same condition at the time of the crash as when it was delivered by McDonnell to the Navy [and] that it was being used for its intended purposes"). This evidence met the requirements and allowed the jury to find the existence of a defect based on circumstantial evidence alone.

Whittaker's reliance on California cases, *e.g., Barrett v. Atlas Powder Co.*, 86 Cal. App.3d 560, 565, 150 Cal.Rptr. 339, 342 (1978), that disallow *res ipsa loquitur*-type instruction for strict liability is inappropriate. The procedural effects of *res ipsa loquitur* in California and Hawaii are quite different, and that difference goes to the heart of the reasoning that led California courts to forbid the doctrine in strict liability cases. *See Tresham v. Ford Motor Co.*, 275 Cal.App.2d 403, 408, 79 Cal.Rptr. 883, 885–86 (1969). Under California law, the application of *res ipsa loquitur* shifts the burden of production[29] to the defendant; unless the defendant then comes forward with evidence suggesting that it was not negligent or that its negligence did not proximately cause the injury, the jury is *required* to find that the accident resulted from the defendant's negligence. Cal.Evid. Code § 646 Law Revision Commission Comment (Deering 1985 Supp.). The doctrine of *res ipsa loquitur* raises a rebuttable presumption of negligence, entitling the plaintiff to a directed verdict in the absence of contrary evidence.

Such a presumption, the California courts hold, is inappropriate in imposing strict liability. To avoid a directed verdict, a defendant would need to come forward with evidence that the product in question was *not* defective or did *not* proximately cause the injury. This is a much more

---

**29.** The application shifts only the burden of production, not the ultimate burden of persuasion. *Frantz v. San Luis Medical Clinic*, 81 Cal.App.3d 34, 42–43, 146 Cal.Rptr. 146, 152 (1978).

difficult burden than producing proof of the exercise of due care to rebut a presumption of negligence. In many strict liability cases, the product involved will be damaged or destroyed, making proof of the lack of a defect virtually impossible. To avoid this presumption and avoid putting defendants in this untenable position, California does not allow *res ipsa* -type instructions on strict liability issues.[30] *Tresham,* 275 Cal.App.2d at 408, 79 Cal.Rptr. at 885–86.

Under Hawaii law, application of *res ipsa loquitur* raises no presumption of negligence. The doctrine merely establishes a prima facie case of negligence; it allows the case to go to the jury. It permits but does *not* compel a finding of negligence, even in the absence of contrary evidence.[31] *Turner v. Willis,* 59 Hawaii 319, 324–25, 582 P.2d 710, 714 (1978); *Cozine v. Hawaiian Catamaran, Ltd.,* 49 Hawaii 77, 87–88, 412 P.2d 669, 678 (1966) (citing *Guanzon v. Kalamau,* 48 Hawaii 330, 335 n. 3, 402 P.2d 289, 292 n. 3 (1965).[32] As a result, a defendant need not come forward with rebuttal evidence to avoid a directed verdict.

Because the doctrine raises no presumption, the reasoning underlying the California courts' refusal to extend the doctrine to strict liability does not apply. The burden of production does not shift, and the Hawaii defendant faces no burden of obtaining often unobtainable rebuttal evidence. The defendant is free to argue that, despite the fact that the accident in question was one which does not *normally* occur in the absence of a defect, there was in fact no defect in this case, even if the defendant cannot otherwise account for the accident.

Consequently, nothing bars application of the *res ipsa loquitur* theory to strict liability. *Stewart v. Ford Motor Co.,* 553 F.2d at 138. This is reflected in Hawaii cases that permit recovery in strict liability based on *res ipsa* -like theories of circumstantial evidence. *See Wakabayashi,* 66 Hawaii at 270, 660 P.2d at 1313–14; *Stewart v. Budget Rent-A-Car,* 52 Hawaii at 75, 470 P.2d at 243–44. In fact, the *Stewart* court in dictum approved a finding of defect based on evidence far less direct than that allowed by the jury instruction in the present case:

In the most extreme circumstances a court might hold that where no specific defect can be shown, recovery is to be allowed anyway as a carefully driven vehicle does not leave the road in the absence of a defect in the car. See *Vanek v. Kirby,* [253] Ore. [494], 450 P.2d 778 (1969). See Note, *Proof of Defect in a Strict Products Liability Case,* 22 Me.L. Rev. 189 (1970).

*Stewart v. Budget Rent-A-Car,* 52 Hawaii at 76 n. 5, 470 P.2d at 244 n. 5.

Moreover, the instructions given are very similar to strict liability instructions approved in product liability cases in other jurisdictions. *See, e.g., Stewart v. Ford*

---

**30.** It would be possible, of course, to use similar wordings for the negligence and strict liability instructions and assign them different procedural effects. This would undoubtedly be confusing for the jury, however, especially because most products liability claims include both negligence and strict liability counts. The California court wisely chose to prevent the presumption in cases in which it is not appropriate by simply forbidding the language that would raise it.

**31.** The circumstantial evidence supporting the application of the doctrine *may,* of course, be so great as to compel an inference of negligence, *see, e.g., Winter v. Scherman,* 57 Hawaii 279, 283, 554 P.2d 1137, 1140 (1976), but the application of *res ipsa loquitur* does not *alone* compel

such a finding. *Cozine v. Hawaiian Catamaran, Ltd.,* 49 Hawaii 77, 87–88, 412 P.2d 669, 678 (1966).

**32.** The jury here was not allowed to infer a defect simply from the fact of the accident. It was also required to find that the Whittaker simulator exploded twice, causing the accident. It was therefore the fact of the second explosion in the barrel that allowed inference of the defect, not the mere fact that the accident occurred. Hawaii law permits such an inference. *See Stewart v. Budget Rent-A-Car,* 52 Hawaii 71, 77, 470 P.2d 240, 244 (1970) (testimony of witness to events surrounding accident sufficient to allow inference of defect); *see also Wakabayashi v. Hertz Corp.,* 66 Hawaii 265, 270, 660 P.2d 1309, 1313–14 (1983).

*Motor Co.*, 553 F.2d at 136; *Dennis v. Ford Motor Co.*, 332 F.Supp. 901, 903 (W.D.Pa.1971), *aff'd*, 471 F.2d 733, 735 (3d Cir.1973); *cf. Chestnut v. Ford Motor Co.*, 445 F.2d 967, 971 (4th Cir.1971) (finding error in instruction that did not reflect this theory); *Moraca v. Ford Motor Co.*, 132 N.J.Super. 117, 332 A.2d 607, 610 (1974), *aff'd*, 66 N.J. 454, 332 A.2d 599 (1975) (same).

In summary, we find that the trial court's interpretation of Hawaii law was correct, and the instructions given by the trial court were appropriate.

## VI.

## BASIS OF JURY VERDICT

### A.  *Standard of Review*

A jury's verdict may not be disturbed by this court if it is supported by substantial evidence. *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984).

### B.  *Necessity of Expert Witnesses*

■■■■ Whittaker in effect claims that the jury's conclusion that the accident involved here "is of a type that does not ordinarily occur in the absence of negligence" is unsupported by substantial evidence.  Because the product and issues involved were of a technical nature, Whittaker argues, the jury could not have reached that conclusion on its own, *cf. Lyu v. Shinn*, 40 Hawaii 198, 202 (1953) (in medical malpractice actions, *res ipsa loquitur* does not apply where the common knowledge or experience of the jury does not allow it to conclude that a patient's condition would not have existed but for the defendants' negligence), and plaintiffs failed to supply any expert evidence to show how a second explosion in the barrel could have occurred. We need not determine whether expert testimony was required here, however, because in any event it was provided on the key issue: that the atomic simulator was designed to explode only once.[33]

In the ordinary application of *res ipsa loquitur*, jurors know the normal operation of the injury-producing instrumentality. For example, in *Wakuya v. Oahu Plumbing & Sheet Metal, Ltd.*, 2 Hawaii App. 373, 636 P.2d 1352 (1981), *aff'd*, 65 Hawaii 592, 656 P.2d 84 (1982), the plaintiff was injured by a vault door handle that came off in her hand as she opened the vault. In holding that the jury should have been instructed on *res ipsa loquitur*, the Hawaii court noted:

> Here, [defendant] Oahu had the responsibility, by contract, for what is described therein as "preventive maintenance" of the instrumentality, including the vault door handle. *Obviously, one of the purposes of the handle on the vault door was that it was to be used in opening the vault door.* This required someone turning and then pulling on the handle. *Obviously, such handles are not supposed to come off in the course of doors being opened in the absence of negligence*, particularly where, as here, ordinary wear and tear on the mechanism is to be dealt with by "preventive maintenance" by Oahu.

*Id.* at 381, 636 P.2d at 1358 (emphasis added); *accord, Winter*, 57 Hawaii at 281, 554 P.2d at 1139 (holding that car does not normally fail to negotiate gentle curve, cross center line, travel on opposite shoulder parallel to pavement for 225 feet and hit utility pole in absence of driver's negligence); *Cozine*, 49 Hawaii at 83, 412 P.2d at 676 ("It requires no expert testimony to enable a jury to infer that in the ordinary course of events and if due care is used the mast of an excursion boat does not snap off, otherwise the patrons of such boats would be few."); *see also Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 741 (5th Cir.1980) (Georgia law looks to "common human experience" to determine whether an event is of a type not normally occurring absent negligence).

Few lay jurors, it is true, would have in their accumulated experience any knowledge of the technical details of an atomic

---

**33.**  Not only was this point made explicitly several times during the trial, it was clearly a basic premise of both sides' arguments and certainly was never disputed by Whittaker.

simulator. This case, however, does not require such knowledge; it merely requires that the jury be informed of what was "obvious" to the jury in *Wakuya:* the normal operation of the injury producing instrumentality, a single explosion. Eyewitness testimony supports the jury's finding that the second explosion came from the Whittaker simulator. Because the jury knew that the simulator was designed to explode only once and reasonably found that it exploded twice, the jury could also reasonably have found that a second explosion would not ordinarily occur in the absence of negligence.[34] *See Ciacci*, 33 Hawaii at 257–58; *Wakuya*, 2 Hawaii App. at 381–82, 636 P.2d at 1358–59.

Whittaker claims that more is needed, that expert testimony must show *how* a second explosion could have occurred or *how* Whittaker's negligence could have caused it.[35] Such a showing would of course be helpful to plaintiffs, but it is not required. For example, the *Wakuya* court approved a *res ipsa loquitur* instruction notwithstanding its observation that "[h]ow or why the handle came off is not explained by the evidence." *Wakuya*, 2 Hawaii App. at 382, 636 P.2d at 1359; *cf. also Wakabayashi*, 66 Hawaii at 269–71, 660 P.2d at 1313 (holding in strict liability context that testimony of eyewitnesses provided sufficient evidence of defect to go to jury without any direct evidence, expert or otherwise, of any specific defect).

### C. Control and Management

Whittaker also argues that no substantial evidence supports the jury's conclusion, implicit in its finding of negligence based on *res ipsa loquitur*, that the Whittaker simulator was substantially unchanged from the time Whittaker delivered it to the Army to the time of the accident. Whittaker points out that the simulator was unpacked several times and stored in an outdoor area, arguing that this shows something could have happened to it after delivery.

Whittaker's evidence does not preclude a finding that the simulator was "substantially unchanged," however; it merely weighs against that finding. "[I]t is enough [to justify the *res ipsa loquitur* instruction] if the plaintiff produces sufficient evidence of careful handling in general, and of the absence of unusual incidents, to permit reasonable persons to conclude that, more likely than not, the event was due to defendant's negligence." W. Keeton, *Prosser and Keeton on Torts*, § 39 (5th ed. 1984); *accord, Ciacci*, 33 Hawaii at 258–59.

Here, plaintiffs presented evidence that the simulator had been stored and inspected by the army, and there was no evidence of unusual incidents. The jury's finding that the atomic simulator was substantially unchanged from the time it left Whittaker's hands to the time of the accident is therefore supported by substantial evidence.

### VII.

### CONSISTENCY OF JURY VERDICT

#### A. Standard of Review

Whether a verdict is consistent is a question of law reviewable *de novo* by this court. *See McConney*, 728 F.2d at 1201.

---

**34.** This finding alone would not be sufficient to attribute the negligence to Whittaker, as it does not provide a ground for determining whether the negligence was in the Army's design or Whittaker's manufacture. In the present case, however, Whittaker itself, in arguing its position that the second explosion did not and in fact could not have come from the Whittaker simulator, presented much evidence that the simulator as designed would explode only once. This evidence was sufficient for the jury to find that there was no defect in design, and, when combined with the finding that the second explosion would not ordinarily occur in the absence of negligence, supported the jury's finding that the Whittaker simulator was defective in manufacture. (The jury specifically found, on a jury form urged by Whittaker, that the simulator was not defective in design but was defective in manufacture.)

**35.** Plaintiffs' claim, that such testimony was provided when Whittaker's expert Dr. Kadlec testified that the explosion could have come from the simulator, takes that passage far out of context. Whittaker is correct in claiming that no expert discussed *how* a second explosion could have taken place in the Whittaker simulator.

## B. Consistency

■ Whittaker argues that the jury's verdict is inconsistent because it found a manufacturing defect but not a design defect. The jury instructions told the jury that it could not find Whittaker liable for a design defect if the government designed the simulator, Whittaker built it according to the government's design, and Whittaker warned the government about any patent errors in the design or dangers from the product.[36] The jury found Whittaker was not liable for a design defect; therefore, Whittaker argues, it must have concluded that Whittaker built the simulator according to the government's design, which is inconsistent with its finding of a manufacturing defect.[37]

Whittaker's logic is flawed. The "design defect" instruction Whittaker points to only serves to absolve it of liability *once a design defect is established.* In this case, the jury never even considered Whittaker's liability for a design defect because it concluded that there *was no* design defect. There is no inconsistency, therefore, with the jury's finding of a manufacturing defect arising from Whittaker's failure to conform to the government design. Whittaker's proposed result would be absurd, as it would never allow the finding of a manu-

**36.** The relevant instruction was:

The defendant Whittaker is not subject to liability for a design defect in the atomic simulator if Whittaker establishes, by a preponderance of the evidence:

1. That the United States established, or approved, reasonably precise specifications for the atomic simulator;
2. That the atomic simulator conformed to those specifications; and
3. That Whittaker warned the United States about patent errors, if any, in the government's specifications, or about dangers, if any, in the use of the atomic simulator that were known to Whittaker but not to the United States.

**37.** The jury returned a special verdict of a manufacturing defect based in part on the following instruction:

In order for the atomic simulator to be in a defective condition at the time of sale to the United States Army, it must have been manu-

facturing defect without a simultaneous design defect.

## VIII.

## MOTION FOR PREJUDGMENT INTEREST

### A. Standard of Review

Interpretation of the Federal Rules of Civil Procedure is a pure question of law, reviewable *de novo* by this court. *Liberty Mutual Insurance Co. v. Equal Employment Opportunity Commission,* 691 F.2d 438, 440 (9th Cir.1982).

### B. Applicability of Rule 59(e)

Plaintiffs claim that the district court erred in ruling that plaintiffs' motion for prejudgment interest was a Rule 59(e) motion to alter or amend a judgment, which must "be served not later than 10 days after entry of the judgment." Fed.R.Civ.P. 59(e). They claim that their motion was brought under Fed.R.Civ.P. 7(b),[38] the general motions rule, and therefore is not subject to Rule 59(e)'s time limitations.[39] This is an issue of first impression in this circuit.

Rule 59(e) was intended to deal with the correction of error, not the initial granting of relief. *See* 6A J. Moore, J. Lucas & G.

factured in a way that did not conform with the plans and specifications furnished to Whittaker by the United States Army and it must have had a propensity for causing physical harm to the user beyond that which would be contemplated by the product's foreseeable and typical user who uses it, with the ordinary knowledge common to the foreseeable and typical user as to its characteristics.

**38.** Plaintiffs' moving papers in the district court indeed characterized the motion as a Rule 7(b) motion, but the substance of the motion rather than the form determines which Rule it falls under. *See United States v. 1982 Sanger 24' Spectra Boat,* 738 F.2d 1043, 1046 (9th Cir.1984).

**39.** Plaintiffs do not deny that the motion was untimely under Rule 59(e) or that timely compliance with Rule 59(e) is jurisdictional. *See* Fed.R.Civ.P. 6(b) and 59(e); *Martin v. Wainwright,* 469 F.2d 1072, 1073 (5th Cir.1972), *cert. denied,* 411 U.S. 909, 93 S.Ct. 1538, 36 L.Ed.2d 199 (1973).

Grotheer, *Moore's Federal Practice* ¶ 59.03 (2d ed. 1985). The Supreme Court described this role in *White v. New Hampshire Department of Employment Security*, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), in which it considered whether attorney's fee awards were within the Rule's scope:

> [Rule 59(e)'s] draftsmen had a clear and narrow aim. According to the accompanying Advisory Committee Report, the Rule was adopted to "mak[e] clear that the district court possesses the power" to *rectify its own mistakes* in the period immediately following the entry of judgment....
>
> Consistently with this original understanding, the federal courts generally have invoked Rule 59(e) only to support *reconsideration of matters properly encompassed in a decision on the merits* .... By contrast, a request for attorney's fees under [42 U.S.C.] § 1988 raises legal issues *collateral to the main cause of action*—issues to which Rule 59(e) was never intended to apply.
>
> Section 1988 provides for awards of attorney's fees only to a "prevailing party." Regardless of when attorney's fees are requested, the court's decision of entitlement to fees will therefore require *an inquiry separate from the decision on the merits—an inquiry that cannot even commence until one party has "prevailed."* Nor can attorney's fees fairly be characterized as an element of "relief" indistinguihshable from other elements. Unlike other judicial relief, the attorney's fees allowed under § 1988 are *not compensation for the injury giving rise to an action.* Their award is

*uniquely separable from the cause of action to be proved at trial....*

As the Court of Appeals for the Fifth Circuit recently stated:

> "[A] motion for attorney's fees is unlike a motion to alter or amend a judgment. It does not imply a change in the judgment, but *merely seeks what is due because of the judgment.* It is, therefore, not governed by the provisions of Rule 59(e)."

*Id.* at 450–52, 102 S.Ct. at 1165–67 (emphasis added; footnotes and citations omitted).[40]

All the emphasized passages apply to a postjudgment first-time motion for prejudgment interest as well as to one for attorney's fees. Such a prejudgment interest motion does not ask the court to reconsider or correct its own mistakes, because the court has not previously considered or decided the issue.[41] The motion addresses an issue collateral to the main cause of action, requiring an inquiry unrelated to the merits that cannot be made until the moving plaintiff has "prevailed" on the merits.[42] Prejudgment interest compensates not for the *injury* giving rise to the action, but for the *delay* between injury and judgment. *See, e.g., Lucas v. Liggett & Myers Tobacco Co.*, 51 Hawaii 346, 348–49, 461 P.2d 140, 143 (1969). Both attorney's fees and prejudgment interest seek what is due because of the judgment, the former in terms of money expended, the latter in terms of time. In light of these factors, *White* strongly suggests that a postjudgment first-time motion for prejudgment interest is not covered by Rule 59(e).

Furthermore, the consequences to litigants of a contrary result are potentially

---

**40.** This purpose is also suggested by the fact that Rule 59(e) sets the same ironclad 10-day time limit as other motions to reconsider the merits. *See, e.g.,* Fed.R.Civ.P. 50(b) (j.n.o.v.), 52(b) (amend findings of fact), & 59(b) (new trial).

**41.** This assumes that an award of prejudgment interest is, as here, discretionary with the court. If an award is mandatory, the court has committed a clerical error in omitting it and a party may move for correction under Rule 60(a). *See*

*Glick v. White Motor Co.*, 458 F.2d 1287, 1293–94 (3d Cir.1972).

**42.** For example, in determining the appropriateness of prejudgment interest, a court may consider the timing and reasonableness of the parties' respective settlement offers and the amount and causes of delays in trial, as plaintiffs here argued below. Neither of these will be finally known until a decision on the merits has been reached.

severe. If a motion for prejudgment interest must be made under Rule 59(e), prevailing parties will have only a ten-day window for requesting what may be a major portion of their ultimate losses. Moreover, because the actual entry of judgment is often a clerical function, a prevailing party may often not be able to anticipate exactly when the "window" will open.

*Elias v. Ford Motor Company*, 734 F.2d 463 (1st Cir.1984), which Whittaker cites for the motion's inclusion under Rule 59(e), is factually distinguishable. Although the *Elias* court states that prejudgment interest is not a "collateral matter" like attorney's fees, the original judgment in that case actually included prejudgment interest, and the prevailing plaintiff had and declined the opportunity to appeal the award. *Elias*, 734 F.2d at 464–65. The disputed motion in *Elias* asked the court to *reconsider* a decision it had already made and was therefore, the court concluded, a Rule 59(e) motion.[43]

█ In light of *White* and the policy underlying Rule 59(e), we hold that a post-judgment first-time motion for prejudgment interest is not a Rule 59(e) motion to alter or amend the judgment but a general motion subject to the general constraints of Rule 7. The motion for prejudgment interest is remanded to the district court for the exercise of its discretion.[44]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

Plaintiffs (appellees/cross-appellants) shall be awarded their costs on appeal.

---

**43.** The other cases cited by Whittaker are even less on point. Another First Circuit case, decided just after *White,* mentions *White* but doesn't consider that case's effect on a prejudgment interest motion. *See Goodman v. Heublein, Inc.,* 682 F.2d 44, 45–47 (2d Cir.1982). *Spurgeon v. Delta Steamship Lines, Inc.,* 387 F.2d 358, 358–59 (2d Cir.1967), a pre-*White* case, relies heavily on the fact that the actual damage award entered in the judgment (and therefore subject to direct appeal) already included prejudgment interest. Finally, *St. Mary's Hospital Medical Center v. Heckler,* 753 F.2d 1362. 1365 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985), merely holds that Rule 59(e) encompasses any motion that draws into question the correctness of the judgment. This again is addressed to error and, as discussed above, the trial court here could not have made an error as to prejudgment interest because it never considered the issue.

**44.** Plaintiffs invite this court to award prejudgment interest itself rather than remand to the district court for such an award. They argue that such interest is routine in wrongful death cases and that the district court has already stated its intention to award such interest. They also note that over seven years has passed since the accident and further delay should be avoided.

Plaintiffs cite no statute that gives this court the jurisdiction to make such an award. *But cf. Lucas,* 51 Hawaii at 351–52, 461 P.2d at 144 (Supreme Court of Hawaii awards interest itself to avoid further delay to plaintiff). Even assuming our power to address plaintiff's claims, however, it would be inappropriate for this court to award interest here. As is evident from the memorandum accompanying plaintiff's original motion for prejudgment interest, such an award requires consideration of factors beyond this court's knowledge, such as settlement attempts and responsibility for delays. For this reason, remand is necessary.