LILIEN G. PETERS, Plaintiff-Appellant, *v.* HANS A. PETERS, Defendant-Appellee

NO. 6874

CIVIL NO. 50391

OCTOBER 6, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

654

## OPINION OF THE COURT BY NAKAMURA, J.

We are asked to review a choice-of-law decision of the Circuit Court of the First Circuit in a negligence action arising from an automobile accident that occurred on the island of Maui while Plaintiff-appellant Lilien G. Peters and her husband, Defendant-appellee Hans A. Peters, both residents of New York, were vacationing in Hawaii. As we do not deem a judicial abrogation of our interspousal tort immunity rule appropriate, and the record discloses adequate grounds for an application of Hawaii's immunity rule rather than the law of the parties' domicile permitting interspousal tort suits, we affirm the award of summary judgment to defendant-appellee.

### I.

But a few facts are essential to our discussion. On April 21, 1975, a "U-Drive" vehicle being driven by Mr. Peters and in which Mrs. Peters was a passenger collided with a truck owned by the Hawaiian Commercial & Sugar Company. Mrs. Peters who was injured in the accident chose to assert her claim for damages in the Circuit Court of the First Circuit. The sole defendant named in the complaint was Mr. Peters, and it ascribed the collision to his negligence. Upon motion of counsel for defendant-appellee, summary judgment was granted Mr. Peters on the strength of the foregoing immunity. A timely appeal to this court followed.

### II.

The authority of our courts has been invoked by plaintiff-appellant to determine whether her spouse should be accountable for an alleged tort of local inception. We are nevertheless confronted by a conflict-of-laws problem due to the presence of a

relevant foreign element, the abode of the parties. Whether our law or that of the domiciliary state should govern the validity of the action under the circumstances involved is a question of first impression in the annals of this court.[1]

Plaintiff-appellant contends the viability of the suit against her husband should be determined in accord with the pertinent law of their domicile. She further views interspousal tort immunity as an anachronism that should be expunged from the jurisprudence of Hawaii. We initially address the second proposition.

### A.

The common law rule of interspousal tort immunity was bottomed on the legal unity of husband and wife, for the two were considered as "one person in law."[2] Among the disabilities thereby thrust upon a woman by marriage was the loss of capacity to contract for herself, or to sue or be sued without joining her husband as a plaintiff or defendant. 1 W. Blackstone, COMMENTARIES *442, *443. The foregoing and other incidents of the marriage status under the common law rendered the maintenance of tort actions

---

[1] A survey of this court's decisions reveals we are without authoritative choice-of-law decisions in the area of torts. While there were choice-of-law implications in Kelley v. Kokua Sales & Supply, Inc., 56 Haw. 204, 532 P.2d 673 (1975), we did not find it necessary to engage in a detailed conflict-of-law analysis as the decision turned on the issue of foreseeability. See also Student Survey of Hawaii Conflict of Laws Cases and Statutes (University of Hawaii School of Law, Fall 1978) (unpublished, in University of Hawaii Law Library). Cf. Dashiell v. Keauhou-Kona Co., 487 F.2d 957, 960 (9th Cir. 1973), and Gates v. P. F. Collier, Inc., 378 F.2d 888, 892 (9th Cir. 1967), where the United States Court of Appeals for the Ninth Circuit found there were no Hawaii decisions governing the choice of law in tort cases and undertook to apply the conflict-of-laws rules generally applied by the courts in the country.

[2] This merger of identities has been described in these terms:

By marriage, the husband and wife are one person in law: *(1)* that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and *cover,* she performs everything; and is therefore called in our law-french a *feme-covert, foemina viro co-operta ;* it is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.* Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage.

(Emphasis in the original). 1 W. Blackstone, COMMENTARIES *442.

between husband and wife impossible. W. Prosser, *The Law of Torts* § 122, at 859-60 (4th ed. 1971).

Changes in the American social order wrote an end to the notion of "a union of person in husband and wife." W. Blackstone, *supra,* at *442. And commencing about 1844, "statutes known as Married Women's Acts, or Emancipation Acts were passed in all American jurisdictions, which were designed primarily to secure to a married woman a separate legal identity and a separate legal estate in her own property." W. Prosser, *supra,* at 861.

In Hawaii, the ancient but unvenerated concept of the female marriage partner's legal subjugation was adopted tardily in 1846 as part of Act 2, 1 Statute Laws of His Majesty Kamehameha III.[3] More than a decade later, while many American jurisdictions were in the process of discarding the hoary concept, the Legislative Council reiterated its adherence thereto when it adopted the Civil Code of the Hawaiian Islands of 1859.[4] And it was not until 1888 that a Married Woman's Act was enacted in the Kingdom. Chapter XI, Session Laws of 1888, established, *inter alia,* the right of a married woman to hold real and personal property in her own right, to make contracts as if she were sole, and to sue and be sued in the same manner as if she were sole.[5] As a consequence, Hawaii like all other states no longer regards husband and wife as an indivisible legal unit

---

[3] Ch. IV, art. I, § IV of said Act read in part:

The wife, whether married in pursuance of this article or heretofore, or whether validly married in this kingdom or in some other country, and residing in this, shall be deemed for all civil purposes, to be merged in her husband, and civilly dead. She shall not, without his consent, unless otherwise stipulated by anterior contract, have legal power to make contracts, or to alienate and dispose of property — she shall not be civilly responsible in any court of justice, without joining her husband in the suit, and she shall in no case be liable to imprisonment in a civil action. The husband shall be personally responsible in damages, for all the tortuous [sic] acts of his wife; for assaults, for slanders, for libels and for consequential injuries done by her to any person or persons in this kingdom.

[4] *See* §§ 1286 and 1287, Civil Code of the Hawaiian Islands, 1859.

[5] Ch. XI, Laws of His Majesty Kalakaua I, passed by the Legislative Assembly of 1888 read in part as follows:

SECTION 1. The real and personal property of a woman shall, upon her marriage, remain her separate property, free from the management, control, debts and obligations of her husband; and a married woman may receive, receipt for, hold, manage and dispose of property, real and personal, in the same manner

for most purposes.[6] *First National Bank of Hawaii v. Gaines,* 16 Haw. 731, 733 (1905). But § 5 of Chapter XI, which granted married women the right to sue in their own names, also carried a proviso reading:

> [B]ut this section shall not be construed to authorize suits between husband and wife.

The language of § 5 with the foregoing limitation remains intact and is presently codified as HRS § 573-5. Since interspousal tort immunity in Hawaii and its conceptual parent, the legal unity of husband and wife, have a definite statutory provenance,[7] the rule is not for judicial discard without compelling reasons.

Deeming the constraint on interspousal actions "a matter of common law," however, plaintiff-appellant urges us to emulate the Supreme Judicial Court of Massachusetts in construing the pertinent statutory provision. In *Lewis v. Lewis,* 370 Mass. 619, 351 N.E.2d 526 (1976), the court found that interspousal tort immunity had not acquired statutory dimension with the passage of a statute substantially similar to § 573-5 in text.[8] It concluded the rule nonetheless

---

as if she were sole: Provided, however, that no sale or mortgage of her real estate *shall be valid without the written consent of her husband.*

SECTION 2. A married woman may make contracts, oral and written, sealed and unsealed, in the same manner as if she were sole, except that she shall not be authorized hereby to make contracts for personal service without the written consent of her husband, nor to contract with her husband.

.   .   .   .

SECTION 5. A married woman may sue and be sued in the same manner as if she were sole; but this section shall not be construed to authorize suits between husband and wife.

[6] Hawaii still recognizes tenancies by the entirety in real property, which are predicated upon the legal unity of husband and wife. Sawada v. Endo, 57 Haw. 608, 612-13, 561 P.2d 1291, 1295 (1977); *see* HRS Chapter 509.

[7] But in Tugaeff v. Tugaeff, 42 Haw. 455 (1958), we acknowledged that the rule and its underlying notions were borrowed from the common law when we said the statute "preserves the common law prohibition based upon the concept of legal identity of husband and wife." *Id.* at 458.

[8] The Massachusetts statute, G.L., ch. 209, § 6, as amended by St. 1963, c. 765, § 2, read as follows:

A married woman may sue and be sued in the same manner as if she were sole; but this section shall not authorize suits between husband and wife except in connection with contracts entered into pursuant to the authority contained in section two.

remained "in its common law status susceptible to reexamination and alteration by . . . [the] court," 370 Mass. at 627-28, 351 N.E.2d at 531, and fashioned a new rule of interspousal tort liability limited "to claims arising out of motor vehicle accidents." 370 Mass. at 630, 351 N.E.2d at 532. But the rule and its history in Hawaii do not permit us to lightly infer it is amenable to judicial modification which would remove the instant situation from its purview.[9]

The Married Woman's Act, presently compiled as HRS Chapter 573, has been subject to extensive amendment since its adoption. Most recently, HRS § § 573-6 and 573-7, covering the debts and liabilities of the husband, were scrutinized and amended to ensure conformity with Article I, § 3 of the Hawaii State Constitution, our Equal Rights Amendment, that prohibits the denial or abridgement of legal rights on the basis of sex.[10] The legislature has not been inactive where marital relations and responsibilities are concerned; it has displayed no disinclination to act when a need for statutory revision is perceived. Under the circumstances, deference to the legislative branch of government is the proper judicial stance. Where aspects of a legislatively adopted public policy statement have been examined and changed by the legislature, it would be presumptuous to believe an unamended aspect has been left for judicial alteration.

We also are unable to conclude the policy on interspousal suits is now bereft of rationality, despite the unanimous or near-unanimous belief of legal writers that the "metaphysical and practical reasons

---

[9] We do not foreclose the possibility of a modification of the rule in other contexts where there may be overriding policy or constitutional concerns, for the considerations supporting immunity are not the same in every adversary situation that may develop between husband and wife.

In Tamashiro v. De Gama, 51 Haw. 74, 450 P.2d 998 (1969), and Petersen v. City & County, 51 Haw. 484, 462 P.2d 1007 (1969), it was urged upon us that policy considerations similar to those supporting interspousal tort immunity also compelled an approval of parent-child immunity. We did not find the argument persuasive and did not adopt the doctrine. And in *Tamashiro* we said "[t]his holding, we caution, is limited to this adversary relationship because other intrafamily adversary situations may involve problems or considerations different from the one at hand." 51 Haw. at 79, 450 P.2d at 1002.

[10] S.L.H. 1978, c. 77. *See also* Hse. Stand. Comm. Rep. No. 309- 78, in 1978 House Journal, at 1526, and Sen. Stand. Comm. Rep. No. 720-78, in 1978 Senate Journal, at 1088.

which prevented such actions ... are no longer applicable." 1 F. Harper & F. James, *The Law of Torts* § 8.10, at 646 (1956). *See also* W. Prosser, *supra,* at 864. For in the considered judgment of the courts or legislatures of nearly half of the states, the rule may still serve a salutary purpose. *See Guffy v. Guffy,* ____ Kan. ____, ____, 631 P.2d 646, 648 (1981); Annot., 92 A.L.R.3d 901 (1979).

### B.

Turning to the primary question regarding the viability of Mrs. Peters' suit, we observe at the outset that the issue is a substantive rather than a procedural matter, and we would not be obliged to apply the law of Hawaii if our conflict-of-laws analysis indicates that resort to the New York law[11] would best serve the interests of the states and persons involved. R. Weintraub, *Commentary on the Conflict of Laws* § 3.2C, at 55 (2d ed. 1980). Furthermore, as the record reveals sufficient contacts with the action, as well as interests therein, on the part of both states, a choice of the law of either would not run afoul of the Due Process and the Full Faith and Credit Clauses of the United States Constitution. *See Allstate Insurance Co. v. Hague,* 101 S. Ct. 633 (1981).

A recapitulation of the actual nature of the action will help to place the problem in clearer perspective. In a moment of candor before the circuit court, plaintiff-appellant characterized the suit as one for "insurance proceeds available for personal injuries." The following excerpt from a memorandum filed in the circuit court by plaintiff-appellant tells us more about its nature:

[T]he only reason plaintiff brings this suit against her husband is to avail herself of the insurance proceeds to cover her injuries. As a practical matter, the insurance company is the party who stands

---

[11] The New York law reads in relevant part:

A married woman has a right of action against her husband for his wrongful or tortious acts resulting to her in any personal injury as defined in section thirty-seven-a of the general construction law, or resulting in injury to her property, as if they were unmarried, and she is liable to her husband for her wrongful or tortious acts resulting in any such personal injury to her husband or to his property, as if they were unmarried.

N.Y. Gen. Oblig. Law § 3-313(2) (McKinney 1978).

to lose if Mrs. Peters sues her husband and prevails. Family solidarity is not threatened by this lawsuit. There is no malice or spite in the lawsuit and the recovery will be limited to the extent of insurance proceeds available for personal injuries.

Since the collision involved a "U-Drive" vehicle, we can assume the insurance proceeds sought, at least in part, are those that might be payable under the liability portion of the insurance policy purchased by the lessor of the vehicle,[12] and the recovery of damages thereunder is still contingent upon a showing of defendant-appellee's fault.

### 1.

The precepts underlying the choice of law in the area of torts have undergone swift and dramatic changes. Until fairly recently, the widely accepted method of selection was a simple search for the law of the place of impact *(lex loci delicti)*. R. Weintraub, *supra*, § 6.1, at 266-67. But as the inadequacy of "a single, rigid, territorially-oriented choice-of-law rule" for the vast range of tort problems was acknowledged, more complex approaches were developed. *Id.* The development of alternatives to the "mechanical method" of *lex loci delicti* was fostered for the most part by legal scholars who advocated the adoption of more flexible analytical frameworks. R. Leflar, *American Conflicts Law* § 131, at 263-64 (3d ed. 1977). But a verdict on a generally acceptable "approach" to replace the unsatisfactory "rule" is yet to be returned by the scholarly jury.[13] The courts,

---

[12] Under the Hawaii Motor Vehicle Accident Reparations Law, HRS Chapter 294, no person may register a motor vehicle in the State unless it is insured under an insurance policy providing certain benefits designated as no-fault benefits in an amount not exceeding $15,000 and liability insurance coverage of not less than $25,000 for possible personal injury and $10,000 for possible property damage that may be sustained in the operation of the vehicle. *See* HRS § § 294-3 and 294-10.

It can be assumed that plaintiff-appellant received her no-fault benefits in reimbursement of at least part of her medical and hospital expenses and wage loss and the instant suit is an attempt to obtain the proceeds of the liability portion of the no-fault policy.

[13] *See* Reese, *Choice of Law: Rules or Approach,* 57 Cornell L. Rev. 315 (1972), for a workable distinction between a "rule" and an "approach." In Professor Reese's view, a "rule" is "a phenomenon found in most areas of the law, namely a formula which once applied will lead the court to a conclusion," and an "approach" is "a system which does no more than state what factor or factors should be considered in arriving at a conclusion." Current legal thought appears to favor "approaches" over "rules."

likewise, have not agreed on what rule, set of rules, or approach works best, as they continue to rely on a variety of theories "more or less interchangeably, and in effect apply a sort of combination of them." R. Leflar, *supra*, § 131, at 264.

Professor David Cavers, an early critic of the traditional choice-of-law rules, found them unsatisfactory because "[t]he court must blind itself to the content of the law to which its rule or principle of selection points and to the result which that law may work in the case before it." Cavers, *A Critique of the Choice-of-Law Problem*, 47 Harv. L. Rev. 173, 180 (1933). He advocated instead, "a system leading to 'principles of preference' based upon choice between laws rather than choice between jurisdictions." R. Leflar, *supra*, § 131, at 263.[14]

Also among the first to offer an alternative to *lex loci delicti* was Professor Brainerd Currie, and his analysis entailed a consideration of the "governmental interests" of the states whose laws might be applicable, but with a basic preference of the forum's own law.[15] At about the same time, the *Restatement of Conflict of Laws* was being revised under the auspices of the American Law Institute. Its draft document proposed what was officially called "the most significant relationship" test, otherwise referred to as the "center of gravity" or "dominant contacts" approach. R. Leflar, *supra*, § 131, at 263. Simply stated, the framework for analysis propounded by *Restatement (Second)* determines rights and liabilities in tort cases on the basis of "the local law of the state which . . . has the most significant relationship to the occurrence and the parties.[16]

---

[14] His complex approach has been described by another writer in these terms:

It was generally thought that he favored "justice in the individual case" and an almost "free law" approach, and that his method was result-selective, *i. e.* favored the application of the "better" of the two or more competing rules of substantive law.

Baade, *Counter-Revolution or Alliance for Progress? Reflections on Reading Cavers, The Choice-of-Law Process*, 46 Tex. L. Rev. 141, 143 (1967).

[15] Leflar describes the Currie approach as follows:

If the forum state has a socio-legal concern with or interest in the outcome of the case, its law should be applied; if the forum has no such interest it should apply the law of the state that does have an interest; if two other states both have an interest it should apply the law of the one that is most similar to the forum's law.

R. Leflar, *supra*, § 135, at 275 (footnote omitted).

[16] *Restatement (Second) of Conflict of Laws* § 145 (1971) reads:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the

More recently, Professor Robert Leflar articulated a decision-reaching method governed by "fundamental policy factors identified as choice-influencing considerations which are deemed to underlie all choice-of-law decision." R. Leflar, *supra*, § 131, at 264 (footnote omitted). And the factors he regards as fundamental are: (1) predictability of result, (2) maintenance of interstate order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law. R. Leflar, *supra*, §§ 103-07.

The foregoing by no means constitutes a survey of legal thought in the area of our present concern. But the concepts embodied in the writings of Professors Cavers, Currie, and Leflar and in *Restatement (Second)* have had significant influence, and "[a]n assessment of the various interests of the states whose laws are in conflict has become the dominant mode of analysis in modern choice of law theory." Silberman, Shaffer v. Heitner: *The End of an Era*, 53 N.Y.U.L. Rev. 33, 80 n.259 (1978).

2.

Stressing *lex loci delicti*'s apparent demise, plaintiff-appellant argues for an adoption of the "dominant contacts" analysis of *Restatement (Second)*. And an examination of the relevant contacts, she maintains, leads to an inescapable conclusion that *lex domicilii* is applicable here, for New York obviously has a greater interest in the marriage and welfare of the parties.

Defendant-appellee counters with statements that *lex loci delicti* is alive and well, we should not embark on a voyage in the "uncharted

---

most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a) the place where the injury occurred,

    (b) the place where the conduct causing the injury occurred,

    (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

    (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

sea" of new approaches, and the traditional rule provides a desirable certainty and predictability of result. If we find the old rule unacceptable, he suggests we follow *Arnett v. Thompson,* 433 S.W.2d 109 (Ky. 1968), where adherence to the old rule was disclaimed but *lex fori* was nevertheless applied on the basis of the forum state's "sufficient contacts" with the action.[17]

Like plaintiff-appellant, we see no basis for the acceptance of *lex loci delicti* as a controlling rule at this point in the growth of American Conflicts law. Nor do we choose to adopt Kentucky's analysis in *Arnett v. Thompson, supra,* as a "formula," for that would wed us to an "approach" nearly as rigid as the unacceptable "rule." The preferred analysis, in our opinion, would be an assessment of the interests and policy factors involved with a purpose of arriving at a desirable result in each situation.

### 3.

Our legislature has indicated that interspousal tort actions should not be countenanced. We assume the rationale for maintaining this policy includes the preservation of marital harmony and the prevention of collusive suits. Legislative wisdom in New York, on the other hand, has concluded that the allowance of interspousal tort actions furthers the interests of the State and the welfare of its domiciliaries. The policy favors the recovery of tort damages by one spouse from the other at the risk of possible marital discord and collusive suits. As Mr. and Mrs. Peters are domiciled in New York, Hawaii's interest in promoting marital harmony pales in the light of New York's predominant interest in their marriage and welfare. Yet, there are other interests and factors to be considered.

Mrs. Peters could have addressed her plea for damages to the courts of her domicile, and it is likely they would have honored an attempt to prove her husband's fault and the resultant injury.[18] She

---

[17] In Arnett v. Thompson, *supra,* the Supreme Court of Kentucky rejected *lex loci delicti* as the controlling rule and substituted a "sufficient contacts" analysis which resulted in an application of its own rule of tort immunity to an interspousal action involving an Ohio couple and an accident occurring in Kentucky.

[18] While a reading of earlier decisions like Mertz v. Mertz, 271 N.Y. 466, 3 N.E.2d 597 (1936), and Coster v. Coster, 289 N.Y. 438, 46 N.E.2d 509 (1943), would cast some doubt on whether Mrs. Peters' suit would be entertained by the courts of New

nonetheless chose to assert her claim in Hawaii, presumably with knowledge that the courts were subject to restraint where interspousal actions are concerned. But "[t]he forum, qua forum, has an interest in preserving the integrity and economy of its judicial process." R. Weintraub, *supra*, § 6.12, at 290.[19] And neither Hawaii's interest in discouraging possibly collusive actions nor the State's reluctance to have its tribunals entertain claims its residents are precluded from filing can be discounted in this instance.

Mrs. Peters also avers her suit was brought "to avail herself of insurance proceeds" and the "insurance company is the party who stands to lose if [she] . . . prevails." That courts elsewhere have justified the abrogation of tort immunity on the prevalence of liability insurance in contemporary society has not escaped us. *See, e.g., Immer v. Risko,* 56 N.J. 482, 489, 267 A.2d 481, 485 (1970); *Digby v. Digby,* _____ R.I. _____, _____, 388 A.2d 1, 3 (1978); *see also Sorenson v. Sorenson,* 369 Mass. 350, 362, 339 N.E.2d 907, 914 (1975). We are mindful that in a typical intrafamilial tort suit the insurer is "the true defendant," the "interests of the parties unite in favor of recovery and family harmony is assured instead of disrupted" thereby. *Tamashiro v. De Gama, supra,* 51 Haw. at 78, 450 P.2d at 1001. But in this case, the presence of insurance raises other considerations we cannot ignore.

We earlier noted the proceeds of the liability portion of an insurance policy purchased by the lessor of a "U-Drive" vehicle to comply with Hawaii's Motor Vehicle Accident Reparations Law most probably were at stake here. Among the reasons advanced for an application of *lex domicilii* in interspousal tort actions with insurance implications is that this "tends to fulfill the general expectations which either spouse's insurer may have held regarding capacity to sue and adjustment of premiums." Comment, Lewis v. Lewis: *Dissol-*

---

York, subsequent decisions like Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), and Keller v. Greyhound Corp., 41 Misc. 2d 255, 244 N.Y.S.2d 882 (1963), indicate the earlier cases probably do not reflect good law now.

[19] *See also* R. Weintraub, *supra,* § 6.12, at 291, and Baker v. Gaffney, 141 F. Supp. 602 (D.D.C. 1956), where the federal district court sitting in Washington, D.C. ruled, on the basis of the common law followed by the courts of the District of Columbia, that an interspousal suit stemming from an accident that occurred in New York could not be maintained, noting the lack of "necessary procedural machinery" for its adjudication.

*ving the "Metaphysical" Merger in Interspousal Torts,* 12 New Eng. L. Rev. 333, 350 (1976). *See* Ford, *Interspousal Liability for Automobile Accidents in the Conflict of Laws: Law and Reason Versus the Restatement,* 15 U. Pitt. L. Rev. 397 (1954). *See also Johnson v. Johnson,* 107 N.H. 30, 32-33, 216 A.2d 781, 783 (1966) (sustaining dismissal of an interspousal action through an application of *lex domicilii* in part because the insurance policy "was doubtless written with the laws of . . . [the domicile] primarily in view").[20] Geography renders it impossible for "U-Drive" vehicles leased in Hawaii to be driven beyond the confines of our island state. And the insurance policies covering them undoubtedly are written with the laws of Hawaii in mind. To have New York law govern a tort action arising from the operation of such a vehicle would, of course, contravene the expectations of both insurer and lessor.

Where a state attracts the number of visitors that Hawaii does, it can be expected that many of them will lease "U-Drive" cars, some of them will be involved in accidents, and more than a few married persons will be injured as a result of their spouses' negligent operation of the vehicles. Our visitors are domiciled throughout the United States and in many foreign countries, and a reliance on the law of the domicile to determine the viability of interspousal actions would neither provide predictability of result nor simplify the judicial task. More importantly, any resulting significant increase in the number of tort actions entertained by our courts will adversely affect insurance premiums indirectly payable by residents of Hawaii who lease "U-Drive" cars, though Hawaii couples remain bound by interspousal immunity and will not benefit from the judicial expansion of compulsory insurance coverage which would be responsible for the premium increase.[21]

---

[20] The court's statement in this regard was:

> If the defendant garaged his car in Massachusetts, probably he had obtained insurance there, and this insurance was doubtless written with the laws of Massachusetts primarily in view. The application of New Hampshire law would expose his insurer to a greater risk than it might reasonably have expected to run, given the Massachusetts local law and the trend toward the choice of the domicile's interspousal law in interstate cases.

107 N.H. at 32-33, 216 A.2d at 783.

[21] Hawaii's geographical configuration compels its residents to lease "U-Drive" vehicles frequently, even while they remain in Hawaii.

Our Motor Vehicle Accident Reparations Law, basically a compulsory, no-fault insurance law, was enacted in 1973 to address problems related to motor vehicle liability insurance, including cost.[22] We cannot disregard the legislative effort to stabilize and reduce motor vehicle liability insurance premium rates. *See* note 22 *supra*. And a judicial decision that has a result of expanding insurance coverage for non-residents, partly at the expense of residents, would be at odds with that policy.

We recognize our decision is not in harmony with the declaration in *Restatement (Second)* that the applicable law in "intra-family immunity" situations "will usually be the local law of the state of the parties' domicil."[23] But considerations of public policy and the dem-

---

[22] Hse. Stand. Comm. Rep. No. 187, in 1973 House Journal, at 836, states the purpose of H. B. No. 637, subsequently approved as S.L.H. 1973, c. 203, as follows:

The purpose of this bill is to amend the existing motor vehicle insurance laws as they relate to tort liability arising out of the maintenance or use of a motor vehicle with two primary objectives in mind: (1) insurance reform in order to (a) expedite the settling of all claims, (b) create a system of reparations for injuries and loss arising from motor vehicle accidents, (c) compensate these damages without regard to fault, and (d) modify tort liability for these accidents; and (2) to establish a system of reasonable cost of motor vehicle insurance with a view to reducing such cost.

Sen. Conf. Comm. Rep. No. 4, in 1973 Senate Journal, at 635, states the purpose of H. B. No. 637 in these terms:

The purpose of this bill, as amended herein, is to amend existing motor vehicle insurance laws as they relate to tort liability arising out of the ownership and use of motor vehicles.

Your Committee is of the belief that a basic, comprehensive, equitable, and reasonably priced auto insurance policy must satisfy each of the following criteria:

(1) Provide for a speedy, adequate and equitable reparation for those injured or otherwise victimized;

(2) Provide for the stabilization and reduction of motor vehicle liability insurance premium rates;

(3) Provide for insurance coverage for all who require it, at a cost within the reach of every licensed driver;

(4) Provide for a compulsory insurance system;

(5) Provide for adequate regulatory control.

[23] *Restatement (Second) of the Conflict of Laws* (1971) provides in pertinent part:
§ 169. Intra-Family Immunity

(1) The law selected by application of the rule of § 145 determines whether one member of a family is immune from tort liability to another member of the family.

(2) The applicable law will usually be the local law of the state of the parties' domicil.

onstrated interests of the State of Hawaii impel the approval of the circuit court's choice of *lex fori* over *lex domicilii.*

The award of summary judgment to defendant-appellee is affirmed.

*Bert Sakuda (L. Richard Fried, Jr.,* and *Craig K. Furusho* with him on the briefs; *Cronin, Fried, Sekiya, Haley & Kekina,* of counsel) for plaintiff-appellant.

*Roy Hughes (James F. Ventura* and *Roy T. Chikamoto* with him on the brief; *Libkuman, Ventura, Moon & Ayabe,* of counsel) for defendant-appellee.