UARCO INC., et al., Plaintiffs,

v.

**Kerry LAM, et al., Defendants.**

**Civ. No. 98–00177 ACK.**

United States District Court,
D. Hawaii.

Sept. 14, 1998.

Jeffrey S. Harris, Torkildson Katz Fonseca Jaffe & Moore, Honolulu, HI, Timothy J. Gerenda, Peter C. Woodford, Seyfarth Shaw Fairweather & Geraldson, Chicago, IL, Michael R. Levinson, Timothy J. Gerend, Alan S. Dalinka, Chicago, IL, for plaintiffs.

Michael R. Marsh, Case Bigelow & Lombardi, Honolulu, HI, Paul H. Parilla, Bradley N. Garber, Parilla Militzok & Shedden, Irvine, CA, for defendants.

### ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

KAY, Chief Judge.

Before the Court is a motion for a preliminary injunction by an employer against two former employees. The Plaintiff employer, UARCO, and its successor corporation, Standard Register, ("Plaintiffs") seek to enjoin Defendants Kerry Lam and Eliott Lum ("Defendants") from violating a noncompete clause in their contracts with UARCO. Pursuant to the findings of fact and conclusions of law below, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

The Court previously denied Plaintiffs' motion for a temporary restraining order, *see* April 2, 1998, Order, but Plaintiffs have provided significant, additional evidence to support this motion. Most importantly, Plaintiffs have shown that UARCO and Standard Register have merged. Accordingly, Standard, as the successor corporation, succeeds to the noncompete agreements by operation of law and therefore may enforce them; no assignment has occurred. The evidence also shows that Defendants did not actually rely on any statement by UARCO that it would cease to exist. Thus, no estoppel applies.

Defendants also have provided additional evidence to oppose this motion. They argue that Plaintiffs have unclean hands because they allegedly agreed with other competitors not to hire each other's sales personnel in violation of antitrust laws. The court finds that Defendants have not presented sufficient evidence that any such agreement was illegal, nor does the harm created by the alleged agreement directly relate to this action. Therefore, the unclean hands defense does not bar this Court from granting Plaintiffs' motion.

### FINDINGS OF FACT

UARCO filed this action against two former employees, Defendants Kerry Lam and

Eliott Lum, seeking an injunction and damages based on Defendants' alleged acts after terminating their employment with UARCO. Plaintiff Standard Register Company subsequently joined this action, and UARCO and Standard Register have since merged.

Defendant Lam began working for UARCO in 1985, and Defendant Lum began working for UARCO in 1981. Prior to joining UARCO, each worked for Burroughs, a competitor of UARCO. When Defendants joined UARCO, each Defendant signed Salesman's Agreements, which contained, among other terms, restrictions regarding Defendants' post-employment activities. The Salesman's Agreements state that the salesman may not use UARCO's confidential information or trade secrets for the benefit of another company. In addition, the Salesman Agreements provide:

> For a period of two years following the termination of his employment ... Salesman agrees that he will not contact, with a view toward selling any product competitive with any product sold or proposed to be sold by Company at the time of the termination of the Salesman's employment, or sell any such product to, any person, firm, association or corporation:
>
> (a) to which Salesman sold any product of Company during the year preceding the termination of Salesman's employment,
>
> (b) which Salesman solicited, contacted, or otherwise dealt with on behalf of Company during the year preceding termination of Salesman's employment,
>
> (c) which is known by Salesman to have been a customer of Company during the year preceding termination of Salesman's employment and which is located either within the geographical territory served by any District Office of Company to which Salesman was assigned during such year or within the same metropolitan area as any customer named in the Confidential Customer List in effect hereunder as of the date of termination of Salesman's employment.

Compl. Exh. A ¶ 8, Exh. B ¶ 8. The Salesman's Agreement further provides that, in the event that a salesperson breaches this paragraph, the Company is entitled to, inter alia, preliminary and permanent injunctions and liquidated damages. Compl. Exh. A ¶ 10, Exh. B ¶ 10.

Defendants resigned from UARCO on or about December 31, 1997. Following Defendants' departures, Defendants have commenced employment with UARCO's competitor Monarch Business Forms ("Monarch"). Plaintiffs allege that Defendants have used UARCO's confidential information and trade secrets in their new employment. Defendants concede that they have informed some of UARCO's customers that they have moved to Monarch, and that they currently are selling business forms to some of those customers.

On March 4, 1998, UARCO filed a motion for a temporary restraining order ("TRO") pending determination of its motion for a preliminary injunction. Standard Register subsequently joined UARCO's motion for a TRO. On April 2, 1998, the Court issued an Order Denying Plaintiffs' motion. On June 1, 1998, Plaintiffs filed a motion for a preliminary injunction and a concise statement of facts in support of their motion. The hearing was set for September 22, 1998. On June 26, 1998, Plaintiffs filed a motion for temporary restraining order or, in the alternative, to advance hearing on motion for preliminary injunction. On July 17, 1998, Defendants filed a memorandum in opposition. On July 24, 1998, Plaintiffs filed a reply. On July 31, 1998, by leave of the Court, Defendants filed a supplemental memorandum in opposition to Plaintiffs' motion. Plaintiffs filed a response on August 4, 1998.

Plaintiffs seek a TRO or a preliminary injunction restraining Defendants and their agents from:

1. Breaching, altering, or discontinuing in any way Defendants' obligations under UARCO Salesman's Agreement executed by Defendants

2. Contacting, directly or indirectly, with a view toward selling any product competitive with any product sold or proposed to be sold by UARCO at the time of Defendants' resignation from UARCO, any customer of UARCO to which Defendants solicited, contacted, or otherwise dealt with

on behalf of UARCO during the year preceding the Defendants' December 31, 1997 resignation from UARCO.

3. Assisting or causing any person, company, association, firm or corporation from contacting, with a view toward selling any product competitive with any product sold or proposed to be sold by UARCO at the time of Defendants' resignation from UARCO, any customer of UARCO to which Defendants solicited, contacted, or otherwise dealt with on behalf of UARCO during the year preceding the Defendants' December 31, 1997 resignation from UARCO.

Any finding of fact more properly deemed, in whole or in part, a conclusion of law shall be deemed as such, and vice versa.

## CONCLUSIONS OF LAW

### I. Preliminary Injunction Standard

The standard for granting a TRO is similar to that for granting a preliminary injunction. *Cf. Los Angeles Unified School Dist. v. United States Dist. Court For Central Dist. of California,* 650 F.2d 1004, 1008 (9th Cir.1981) (standard for preliminary injunction is at least as strict as that for a TRO) (Ferguson, J., dissenting); *Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci,* 857 F.2d 505, 507 (9th Cir.1988) (district court denied motion for TRO which was treated by stipulation as also a motion for preliminary injunction).

In *Miller v. California Pacific Medical Ctr.,* 19 F.3d 449 (9th Cir.1994), the Ninth Circuit set forth the standard for granting a preliminary injunction and TRO as follows:

Traditionally we consider (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships· favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

*Id.* 19 F.3d at 456 (citing *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987)).

The moving party must show 'either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.'

*Miller,* 19 F.3d at 456 (quoting *Senate of California v. Mosbacher,* 968 F.2d 974, 977 (9th Cir.1992)).

'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'

*Miller,* 19 F.3d at 456 (quoting *Odessa Union,* 833 F.2d at 174).

▇ The grant or denial of a TRO or preliminary injunction is reviewed for abuse of discretion. *See Miss Universe, Inc. v. Flesher,* 605 F.2d 1130, 1132–33 (9th Cir. 1979).

### II. Discussion

▇ The Court will consider (1) Plaintiffs' likelihood of success; (2) the possibility of irreparable injury to Plaintiffs; (3) the balance of hardships; and (4) the public interest.

### LIKELIHOOD OF SUCCESS

▇ In seeking a TRO or preliminary injunction, the plaintiff's likelihood of success determines what other elements the plaintiff needs to prove. If the plaintiff can show *"probable* success on the merits" then the plaintiff needs only to "show ... the possibility of irreparable harm." *Miller v. California Pacific Medical Center,* 19 F.3d 449, 456 (9th Cir.1994). If, however, the plaintiff can only show "a *'fair'* chance of success," then it must also "show that there are serious questions going to the merits of the case and that the balance of the hardships tips decidedly in its favor." *Id.* 19 F.3d at 460 n. 5; *Chalk v. U.S. District Court Cent. Dist. of California,* 840 F.2d 701, 704 (9th Cir.1988). If the plaintiff cannot establish at least a "fair chance" of success, no TRO should be granted.

Plaintiffs argue that they are likely to succeed on their breach of contract claim because it is undisputed that Defendants entered into the Salesman's Agreements, and Defendants' actions breach these agreements. Defendants concede that, while employed by Monarch, they have informed former UARCO clients with whom they dealt on behalf of UARCO that they now work for Monarch and they have sold Monarch products to some of these clients. In its April 2, 1998, Order, the Court resolved a number of disputes regarding the enforceability of the Salesman's Agreements, but others remained unresolved pending discovery. The Court now addresses these issues.

### i. Estoppel

■ The Court previously noted that Plaintiffs may be estopped from enforcing the Salesman's Agreements because prior to Defendants' departure from UARCO, UARCO informed Defendants that UARCO would cease to exist. The Court stated in its April 2, 1998, Order, "Although many facts are not yet known regarding Defendants' possible reliance, the Court notes that it would be reasonable to conclude that Defendants' covenants not to compete would not be enforced following a sale of UARCO because, as personal services contracts, covenants not to compete are not assignable." Order at 9.

In support of this motion, Plaintiffs have provided evidence that Defendants did not in fact believe that the agreements were unenforceable when they left UARCO. Both Defendants testified that they believed they were bound to the Salesman's Agreements when they left UARCO. *See* Pl. Concise Facts, Exh. D at 94–95, Exh. E at 59. Absent actual reliance, no estoppel applies.

### ii. Scope of the Noncompetition Agreements

■ As the Court previously noted, the restrictions in the Salesman's Agreements are valid under Hawaii law. Hawaii statutory law provides, "Every contract ... in restraint of trade or commerce in the State ... is illegal." H.R.S. § 480–4(a). The same statute further provides:

[W]ithout limiting the application of the foregoing subsection (a) it shall be *lawful* for a person to enter into any of the following restrictive covenants or agreements ancillary to a legitimate purpose not violative of this chapter, unless the effect thereof may be substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the State...

(4) A covenant or agreement by an employee or agent not to use the trade secrets of the employer or principal in competition with the employee's or agent's employer or principal ... after the termination of employment, within such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent.

H.R.S. § 480–4(c) (emphasis added).

■ Under Hawaii law interpreting H.R.S. § 480–4, restrictive covenants should be interpreted "much the same way that federal courts would, in Section 1 Sherman Act cases, analyze such covenants." *Technicolor, Inc. v. Traeger*, 57 Haw. 113, 121–22, 551 P.2d 163 (1976). That is, for restrictive covenants that are not per se illegal, courts should determine as a matter of law whether a restrictive covenant is reasonable. *Id.* 57 Haw. at 122, 551 P.2d 163. "In making this analysis, the court must examine such factors as geographical scope, length of time, and breadth of the restriction placed on a given activity." *Id.*

The Salesman's Agreement imposes reasonable restrictions on its former employees' contacts with customers. In *Technicolor*, the Hawaii Supreme Court found reasonable a restrictive covenant that prohibited an employee from "be[ing] connected in any manner with any business or activity in the State of Hawaii" that is competitive with the employer for a period of three years following the employee's termination. 57 Haw. at 115 n. 2 & 123, 551 P.2d 163. The Salesman's Agreement in this case is less restrictive than that in *Technicolor*. The Salesman's Agreement's restrictions regarding customer contact in this case is limited to two years following termination. In addition, an em-

ployee is not prohibited from working for a competitor, but only in assisting the competitor in selling *products* that are competitive with the employer's products; even this restriction applies only when contacting certain customers. In light of *Technicolor,* the Salesman's Agreements' restrictions regarding customer contacts are clearly reasonable.

The Salesman's Agreements do not provide time restrictions regarding the restrictions on disclosure and use of confidential information and trade secrets. Presumably, however, these restrictions have a built-in time limitation: they endure only as long as the information is kept secret. *See Henry Hope X–Ray Products, Inc. v. Marron Carrel, Inc.,* 674 F.2d 1336, 1342 (9th Cir.1982) ("The limitation to confidential information contains the implicit temporal limitation that information may be disclosed when it ceases to be confidential."). Thus, these restrictions are also reasonable.

### iii. Enforceability of the Agreements

■ Although Plaintiffs are not estopped from enforcing the Salesman's Agreements and these agreements are not impermissibly broad under Hawaii law, the question remains whether they are enforceable in light of the fact that UARCO has merged with Standard. The Court previously observed that covenants not to compete are not assignable. *See* Order at 10 (citing *Reynolds and Reynolds Co. v. Hardee,* 932 F.Supp. 149, 153 (E.D.Va.1996), *aff'd,* 133 F.3d 916, 1997 WL 794127 (4th Cir.1997); *The Fonda Group, Inc. v. Erving Indus.,* 897 F.Supp. 230, 232 (E.D.Pa.1995)). The Court further stated that "the enforceability of a covenant not to compete may differ in the context of a merger." Order at 11 (citing *Equifax Servs., Inc. v. Hitz,* 905 F.2d 1355, 1361 (10th Cir.1990); *Alexander & Alexander, Inc. v. Koelz,* 722 S.W.2d 311 (Mo. Ct.App.1986)).

In the Court's previous Order, the Court found that Plaintiffs had failed to establish a likelihood of success in part because UARCO could not assign the covenants to Standard, UARCO may not have incurred damages because it ceased doing business, and that a merger between UARCO and Standard had not yet occurred. The facts at this time have significantly changed. UARCO has since merged with Standard [1], and UARCO's business continues to be pursued by Standard as UARCO's successor. Thus, the only remaining question is whether a covenant not to compete is enforceable following a merger.

■ As the Court indicated previously, the enforceability of a covenant not to compete differs in the contexts of mergers and assignments. A covenant not to compete is not assignable because it is essentially a personal services contract. Statutory and case law are clear, however, that, following a merger, the successor corporation possesses all obligations and rights of the predecessor corporation. *See, e.g., Alexander & Alexander, Inc. v. Koelz,* 722 S.W.2d 311, 313 (Mo. Ct.App.1986) ("[A] change in form in which the employer does business such as the merger in this case, while involving a formal transfer from one entity to another, should not be seen as creating an assignment of personal services contracts."); H.R.S. § 415–76 ("[F]ollowing a merger, t]he surviving corporation shall thereupon and thereafter possess all of the rights, privileges, immunities, and franchises, of a public as well as a private nature. . . .") [2] Thus, the Court finds that Standard, as the successor corporation to UARCO, may enforce the covenants not to compete because they pass by operation of law to Standard; UARCO did not assign the Salesman's Agreements to Standard.

Defendants argue that the merger cannot "resurrect" the Salesman's Agreements. The Court agrees that a merger cannot create a right that was not held by a predeces-

---

**1.** Although a merger apparently was contemplated from the outset, there was a transition period of approximately three months between the time when Standard purchased the stock of UARCO and the point at which the merger became effective.

**2.** Furthermore, in two cases very similar to this one, courts have ruled that Standard may enforce covenants not to compete against former UARCO salespersons in light of the merger. *See UARCO Inc. v. Dupea,* No. C98–259R, at 7–8 (W.D.Wash. July 27, 1998); *UARCO Inc. v. Daniels,* Civ. No. 98–265–JO, at 4 (D.Or. July 2, 1998).

sor corporation at the time of the merger. Here, however, UARCO had a right to enforce the Salesman's Agreements at the time of the merger, but the Court denied UARCO's earlier motion for a TRO in part because UARCO had not shown that it was likely that it was harmed by a breach of the Salesman's Agreements. Specifically, at the time UARCO filed its motion for a TRO, UARCO did not show that it continued to operate other than to fill existing orders. In light of the merger, however, UARCO has shown a likelihood of success on the merits because Standard, as UARCO's successor, operates UARCO's business.

### iv. Choice of Law

 Defendants also argue that California law applies and, under California law, covenants not to compete are unenforceable. In the Court's previous Order, the Court stated that the facts presented at that time did not clearly establish that California law applies but noted that further facts may arise in the future. Defendants have failed to provide any evidence of additional facts relating to California, and, as explained below, Hawaii law applies.

 In diversity cases, the Court must apply the forum's law in resolving conflict of laws issues. *See Van Dusen v. Barrack,* 376 U.S. 612, 628, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Lettieri v. Equitable Life Assurance Society of the U.S.,* 627 F.2d 930, 932 (9th Cir.1980). Hawaii resolves its conflict of laws issues by deciding which State has the strongest interest in seeing its law applied to a particular case. *See Lewis v. Lewis,* 69 Haw. 497, 499, 748 P.2d 1362 (1988); *Peters v. Peters,* 63 Haw. 653, 634 P.2d 586 (1981). There is a presumption that Hawaii law applies unless another state's law "would best serve the interests of the states and persons involved." *Peters,* 63 Haw. at 660, 634 P.2d 586. The Hawaii Supreme Court phrased the rule as "an assessment of the interests and policy factors involved with a purpose of arriving at a desirable result in each situation." *Id.* 63 Haw. at 664, 634 P.2d 586; *see also Beals v. Kiewit Pacific Co., Inc.,* 825 F.Supp. 926, 930 (D.Haw.1993) (following *Peters*).

Hawaii courts also look to the Restatement for guidance regarding conflict of laws. *See, e.g., California Fed. Sav. and Loan Assoc. v. Bell,* 6 Haw.App. 597, 605–06, 735 P.2d 499 (1987). The Ninth Circuit has summarized the Restatement's position as follows:

> Under Section 188 of the Restatement (Second) of Conflicts of Laws (1971), "the local law of the state which ... has the most significant relationship to the transaction" applies to questions of contract interpretation absent an effective choice of law by the parties. Section 188(2) states the criteria in determining the significance of the relationship: (1) the place of contracting, negotiating, and performance of the contract; (2) the location of the subject matter of the contract; and (3) the domicile, nationality, place of incorporation, and place of business of the parties.

*Commercial Ins. Co. v. Pacific–Peru Constr. Corp.,* 558 F.2d 948, 952 (9th Cir.1977).

Defendants argue that California law applies because UARCO and Monarch are both California based companies and that Defendants worked for UARCO's California office. In addition, part of Defendant Lum's contract negotiations occurred in California. Orders Defendants received from customers were sent to California and most of the products Defendants sold were manufactured in California. On the other hand, Defendants are Hawaii citizens, and they signed the Salesman's Agreements in Hawaii. Furthermore, they conducted their duties exclusively in Hawaii. Although the products they sold came from California, they were sent to customers in Hawaii. In light of these facts, Defendants' contacts with California do not overcome the presumption that Hawaii law applies.

Defendants argue that Hawaii's interest is limited because Hawaii law would operate to the detriment rather than the benefit of the Hawaii citizens in this suit. Hawaii law permitting covenants not to compete, however, reflects a policy decision that balances the rights of certain employees against the citizens' interest in protecting business in Hawaii. Although UARCO is not incorporated in Hawaii, Hawaii has an interest in encour-

aging corporations to do business in Hawaii; these businesses may, as here, employ Hawaii citizens. Thus Hawaii has an interest in this law suit.

### v. Unclean Hands

■ The Court previously found that the unclean hands defense did not apply in this case. Defendants had argued that UARCO may have unclean hands because it may have violated Burroughs' noncompetition agreements when they hired Defendants and then sold products to Defendants' former customers, and thus UARCO should not be permitted to enforce their noncompetition agreements in equity. The Court concluded, however, that Defendants were not harmed by any violation of Burroughs' agreements but actually participated and benefitted from it, and thus the unclean hands defense would not bar this action.[3] Defendants now raise a new unclean hands defense, but the Court finds that it meets the same fate.

Defendants argue that Plaintiffs may not enforce the Salesman's Agreements because these agreements are the product of an illegal agreement between Plaintiffs and other competitors not to hire each other's sales personnel. Defendants have produced affidavits showing that UARCO agreed with certain other competitors not to hire each other's sales representatives, and that this group of competitors agreed to use noncompetition agreements to further this allegedly illegal conspiracy. Defendants therefore conclude that Plaintiffs have unclean hands.

■ Even if Plaintiffs entered into these agreements—and Defendants have provided substantial evidence that they did[4]—the Court finds that Defendants have not sufficiently established that the unclean hands defense applies. First, the Court notes that it is unclear whether such an agreement is illegal. A court must apply the rule of reason to determine whether such an agreement is illegal. See *Aydin Corp. v. Loral Corp.*,

718 F.2d 897, 900 (9th Cir.1983) ("Employee covenants not to compete or interfere with the employer's business after the end of the employment relationship should not be tested under the per se rule."); *Union Circulation Co. v. Federal Trade Comm'n*, 241 F.2d 652, 657 (2d Cir.1957) (applying the rule of reason to agreements between competitors not to hire each other's employees). To determine the legality of no-hire agreements among competitors, "courts should examine the alternative employment opportunities available to those employees affected by the agreement." Brian R. Henry and Joseph M. Miller, *"Sorry, We Can't Hire You... We Promised Not To": The Antitrust Implications of Entering into No–Hire Agreements*, 11–Fall Antitrust 39, 41 (1996). In this case, Defendants were able to move from Burroughs to UARCO to Monarch, and thus the Court questions the extent of any anticompetitive effects in the employment market that includes UARCO's employees.

■ Furthermore, even assuming that the alleged agreement between UARCO and some of its competitors were illegal, the harm of which Defendants complain is not directly related to that agreement. As the Court previously noted, "What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts...." Order at 13 (quoting *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir.1963)). In other words, the harm alleged must be sufficiently related to the right asserted in the instant lawsuit.

Defendants do not argue that they were unable to find employment due to the alleged no-hire agreement. On the contrary, they found employment with a competitor who did not participate in the agreement. Defendants also do not argue that the Salesman's Agreements were illegal; in fact, as discussed above, the noncompetition clauses are

---

**3.** The Court notes that Defendants testified at their depositions that they (and therefore UARCO) did not violate the Burroughs agreement. Pl. Concise Facts, Exh. D at 167, Exh. E at 85.

**4.** Plaintiffs have moved to strike one of Defendants' key affidavits on the grounds that it is hearsay. Because the Court concludes that the unclean hands defense does not bar the Plaintiffs from obtaining a preliminary injunction, the Court declines to rule on Plaintiffs' motion to strike.

permissible under Hawaii law. Thus, Defendants argument is that UARCO asked Defendants to sign these agreements and seeks to enforce these agreements because it participated in the no-hire agreements. In other words, although UARCO could singularly maintain noncompetition agreements, Plaintiffs argue that the fact that these agreements were part of an illegal conspiracy means that UARCO has unclean hands.

In light of the fact that the illegality of the alleged no-hire agreements is uncertain and the fact that Defendant's injury is not directly related to the allegedly illegal agreement, the Court concludes that the doctrine of unclean hands does not bar Plaintiffs from obtaining a preliminary injunction. The Court makes no finding at this time regarding the existence of a no-hire agreement, the illegality of such an agreement, or its relationship to the instant law suit, and thus Defendants may raise these issues again at trial.

### vi. Breach of Salesman's Agreements

Defendants do not argue that they have not breached the Salesman's Agreements. In their depositions, they stated that they called customers with whom they worked while they were employed at UARCO, and they informed these former customers that they now work for Monarch. Defendants have subsequently sold Monarch products to these customers. Thus, Defendants have breached the Salesman's Agreements.[5]

It is also likely that Defendants used confidential information belonging to UARCO to sell Monarch products to these customers. Plaintiffs have shown evidence that the pricing of business forms is tailored for each customer. As the Court previously noted, a list of UARCO's clients and those clients' preferences and pricing information associated with those clients is likely to constitute trade secrets. *See* April 2, 1998, Order at 24. The Court observed, however, that some of those clients were brought to UARCO by Defendants, and thus information associated with those particular clients is not likely to constitute confidential information. The Court also stated, "UARCO has not sufficiently defined what information is secret and owned by UARCO so that the Court may issue a TRO that is not overbroad." Order at 24. Plaintiffs have not provided a more clear definition of which information is secret, and, in light of the Court's granting of Plaintiffs' preliminary injunction with respect to contact with and selling to former UARCO clients, the Court finds that there is little need for an additional restraint on the use of information regarding those same clients.

### 1. *IRREPARABLE INJURY*

■ The Court previously observed that the loss of clients and market share is not economic loss that can be fully compensated by a damage award. April 2, 1998, Order at 25 (citing *Rent–A–Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991); *Express One Int'l, Inc. v. United States Postal Serv.*, 814 F.Supp. 87, 91 (D.D.C.1992) (finding that potential loss of a government contract would be irreparable harm)). The Court thereby concluded, "Were UARCO continuing its operations indefinitely (and if UARCO's claims were likely to succeed), UARCO would have shown a strong possibility of irreparable harm." Order at 26. Plaintiffs at this point have shown that UARCO's business continues and that their claims are likely to suc-

---

**5.** Defendants previously argued that the Salesman's Agreements prohibited only the solicitation of certain former UARCO clients and not the selling of products in the event that former UARCO clients contacted Defendants. The Court noted in its previous Order that UARCO may be estopped from asserting a more broad interpretation given that it asserted the narrow interpretation with respect to the Burroughs agreement, assuming the Burroughs agreement was similarly worded. *See* Order at 12. The Court notes that when UARCO's attorneys wrote Defendants in January 1998 to remind them of their covenants not to compete, the attorneys stated only that the Defendants should not "contact" their former clients, thereby implying that the more narrow interpretation of the Burroughs agreement applies to the UARCO agreement. The parties have been unable to locate a copy of the Burroughs noncompetition agreement, however, and thus no estoppel can be established. Given that the contract specifically prohibits contacting *or* selling products, the Court finds that selling products are prohibited even when former UARCO customers contact Defendants (subject to the time and product limitations specified in the Salesman's Agreements).

ceed. Accordingly, the Court finds that Plaintiffs have established a strong possibility of irreparable harm.

## 2. *BALANCE OF HARDSHIPS*

■ For this factor, the Court must identify the harm which a TRO or preliminary injunction might cause the Defendants and weigh it against the Plaintiffs' threatened injury. *Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir.1980). "[T]he less likely it is the plaintiff will succeed [on the merits], the more the balance [of hardships] need weigh toward its side." *Henri Studio, Inc. v. Outdoor Mktg., Inc.*, 1997 WL 652351 (N.D.Ill. Oct. 14, 1997). The Court previously concluded, "In light of the unlikelihood of Plaintiffs' success in this case, the balance of hardships tips in favor of Defendants." Order at 26.

At this point, Plaintiffs have established a likelihood of success and have produced evidence showing that the balance of hardships weighs evenly between Plaintiffs and Defendants. The Court previously observed, "If a TRO were issued, Defendants would suffer by being greatly restricted in the course of their employment. Although they may theoretically contact customers with whom they have had no contact during the past year of employment at UARCO, it is unclear the extent to which Defendants would be able to represent Monarch in Hawaii." Order at 27. Plaintiffs have since provided deposition testimony showing that Defendant Lam has worked at Monarch with some customers other than those he had at UARCO, and that Defendant Lum has sold some products that are not competitive with products sold by UARCO. *See* Pl. Concise Statement, Exh. D at 136, Exh. E at 24.

The Court also previously noted that if the Court issues a TRO (or preliminary injunction), such an order would not prohibit Monarch from competing with UARCO's customers as Monarch is not named as a defendant in this suit. Thus, the benefit to Plaintiffs of a preliminary injunction is limited. In light of this fact, the likelihood of Plaintiffs' success, and the evidence that a TRO or preliminary injunction will not completely preclude

Defendants from working, the Court concludes that the balance of hardships weighs evenly between Plaintiffs and Defendants.

## 3. *PUBLIC INTEREST*

Under the Ninth Circuit's holding in *Miller*, 19 F.3d at 456, the Court must consider whether the public interest will be advanced by granting the preliminary relief. Hawaii statutory law provides, "Every contract ... in restraint of trade or commerce ... is illegal." H.R.S. § 480–4. This provision specifically exempts reasonable noncompetition agreements, and thereby establishes a policy in favor of such agreements.[6]

## *ANALYSIS OF ALL FACTORS*

■ In sum, Plaintiffs have established a likelihood of success on the merits. UARCO's merger with Standard in addition to the deposition testimony of Defendants shows that Plaintiffs' are likely to succeed in their enforcement of the Salesman's Agreements. Plaintiffs have also shown a strong possibility of irreparable harm because UARCO's former business continues to exist. The balance of hardships does not weigh in favor of either party, and public policy does not favor restraints of trade. On balance, the Court finds that the issuance of a preliminary injunction is proper. The Court chooses to grant Plaintiffs' motion to advance the hearing on the preliminary injunction rather than issue a TRO because the Court has already heard a motion for a TRO in this case and the parties have had ample opportunity to develop the factual record to support or oppose a preliminary injunction.

The Court therefore enjoins Defendants from:

1. Breaching, altering, or discontinuing in any way Defendants' obligations under UARCO Salesman's Agreement executed by Defendants

2. Contacting, directly or indirectly, with a view toward selling any product competitive with any product sold or proposed to be sold by UARCO at the time of Defendants' resignation from UARCO, any customer of UARCO to which Defendants so-

---

6. The Court thereby modifies its previous Order in this case regarding this issue.

licited, contacted, or otherwise dealt with on behalf of UARCO during the year preceding the Defendants' December 31, 1997 resignation from UARCO.

3. Assisting or causing any person, company, association, firm or corporation from contacting, with a view toward selling any product competitive with any product sold or proposed to be sold by UARCO at the time of Defendants' resignation from UARCO, any customer of UARCO to which Defendants solicited, contacted, or otherwise dealt with on behalf of UARCO during the year preceding the Defendants' December 31, 1997 resignation from UARCO.

In exercising its equitable powers and balancing the factors considered, the Court fashions this preliminary injunction to be limited to Defendants' activities in the future. Specifically, Defendants may not breach the Salesman's Agreements or solicit or sell products to former UARCO customers (subject to the limitations in the Salesman's Agreements).[7] The injunction shall not apply to existing contracts into which Monarch has entered with former UARCO customers. The Court notes that Monarch is not a party to this action and is not subject to this preliminary injunction.

■ With respect to security, the Court notes that Plaintiffs should provide an amount equal to the expected salaries of Defendants for one year. A trial is likely to be scheduled within the next year, and thus one year's salary should sufficiently protect Defendants in the event that they prevail at trial. At their depositions, Defendants stated that they are guaranteed salaries by Monarch for their first year of employment, which ends in December 1998. Defendant Lam's guaranteed annual salary is $117,000 gross, and Defendant Lum's guaranteed annual salary is $31,200 net. Based on their salaries for this calendar year and in an abundance of caution, the Court requires Plaintiffs to provide a $125,000 bond for De-

fendant Lam and a $50,000 bond for Defendant Lum.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

IT IS SO ORDERED.

---

[7]. The Court notes that many of the former UARCO customers to whom Defendants currently sell Monarch products were customers of Defendants when Defendants worked for Burroughs. UARCO's Salesman's Agreements, however, do not provide an exception for customers whom Defendants brought from Burroughs to UARCO. In addition, Plaintiffs note that UARCO serviced these customers for many years while Defendants worked for UARCO.